Robert L. McNEELY, Appellant,

v.

UNITED STATES, Appellee.

No. 98–CF–924.

District of Columbia Court of Appeals.

Argued June 18, 2001.

Decided May 12, 2005.

Kenneth D. Auerbach, Silver Spring, MD, for appellant.

Elizabeth Trosman, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher, Roy W. McLeese, III, Darrell C. Valdez, and Maria N. Lerner, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB, RUIZ and GLICKMAN, Associate Judges.

RUIZ, Associate Judge:

Robert McNeely appeals convictions on two counts of violating the Pit Bull and Rottweiler Dangerous Dog Designation Emergency Amendment Act of 1996 (the "Pit Bull Act" or "Act"). *See* D.C. Act 11–257, 43 D.C.Reg. 2156 (Apr. 16, 1996), *amending* D.C.Code § 6–1021.6(b) (1995), *re-codified at* D.C.Code § 8–1906(b) (2001). He argues that his convictions should be reversed because the Pit Bull Act denies due process of law and because the prosecutor engaged in improper closing and rebuttal arguments. In support of the former claim, McNeely contends, first, that the Pit Bull Act does not give "fair warning" of the criminally proscribed conduct and, second, that the Act constitutes an impermissible strict liability felony. We affirm.

## I.

At approximately 1:00 a.m. on May 13, 1996, Helen Avery carried a bag of spoiled food to the trash can behind her home. As she replaced the can's lid, Avery saw two dogs appear from under the steps of her back porch. The dogs charged towards her, forcing Avery to seek an escape by scaling a fence to her neighbor's yard. Unfortunately, she did not evade the dogs quickly enough: one of then seized Avery by the back of her leg and pulled her off the fence, while the other dog jumped on top of her as she fell backwards. During the ensuing attack, skin, muscle, and nerve tissues were bitten off from various parts of her body, including her leg and both arms; one of her toes was nearly bitten off; and she lost a large amount of blood. The attack finally ended when Avery's son, Jerrel Bryant, and two other men successfully chased the dogs off by beating them with an ax and baseball bat.

Officer Patrick Keller of the Metropolitan Police Department responded to an emergency phone call placed by Carey Smith, one of Avery's neighbors who had witnessed the attack. The dogs had since

departed from the scene, but Officer Keller was able to follow a trail of blood he found in the alley which led several hundred feet to a badly wounded dog collapsed in the backyard of McNeely's home at 79 Q Street, S.W. Another dog was also present. Having recently returned home from a wedding earlier that day, McNeely spoke with Officer Keller and admitted that he owned both dogs.[1] Officer Keller inspected McNeely's dog kennel and backyard, noting that, while the kennel was closed, secured, and had no openings in it from which the dogs could escape, the backyard fence was dilapidated and had been dug out in various places.[2]

On May 29, 1996, McNeely was indicted on two counts of violating the Pit Bull Act by allegedly owning the two pit bulls that unprovokedly attacked Avery. *See* D.C. Act 11–257, 43 D.C.Reg. 2156, *amending* D.C.Code § 6–1021.6(b). Under the Act, each violation exposed McNeely to a potential fine not to exceed $20,000 and two years of imprisonment. *See id.* Defense counsel filed a pre-trial motion seeking dismissal of the indictment on various grounds, including that the Act contravened due process of law because it was impermissibly vague and because it imposed felony liability in the absence of fault. The government opposed the motion, arguing that the Pit Bull Act was not vague because it was not standardless, and although it did not expressly require a mental state reflecting some sort of malice or fault, it could properly be construed as requiring proof that the accused knowingly

owned a pit bull. Applying *Staples v. United States,* 511 U.S. 600, 606, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), the court reasoned that, because the express language of the Act was silent in regard to criminal *mens rea,* and because the Council of the District of Columbia did not otherwise expressly or impliedly indicate that it intended to impose strict criminal liability, the court must impute to the Pit Bull Act a basic *scienter* requirement. The judge accordingly interpreted the law as requiring the prosecution to prove not only that the pit bulls attacked without provocation, but also that McNeely knew that the dogs he owned were pit bulls.

McNeely did not dispute at trial, nor does he now on appeal, that he knew that his dogs were pit bulls. His defense at trial centered largely on the absence of evidence establishing beyond a reasonable doubt that the attack upon Avery was unprovoked. Lending general support to McNeely, Susan Simms testified that they both lived at 79 Q Street, S.W., and that, on the day preceding the attack, she and McNeely left the house around noon for a wedding reception in Maryland and did not return until 2:00 a.m. the next morning, after the attack had occurred. She stated that she had fed the dogs the previous morning at 10:00 a.m. and that the dogs had been locked in the kennel.

During the government's closing argument, the prosecutor reminded the jury that McNeely's knowing ownership of the pit bulls was established by his own admis-

---

1. Officer Keller believed the dogs' names were "Bruno" and "White Boy." As he described them, "[o]ne was basically all black and the other one was basically all white."

2. With regard to the apparently well-constructed kennel, McNeely was given specifications by Rosemary Vozobule, director of the Washington Humane Society's ("WHS") law enforcement program, at an indiscernible

"time when we [WHS] placed a requirement upon Mr. McNeely in order to retrieve a couple of dogs that we had in our custody." It is unclear whether the "couple of dogs" to which Vozobule referred in her trial testimony are the same pit bulls at issue here, other pit bulls, or dogs of some other breed owned by appellant.

sion. Apparently attempting to summarize the evidence of the unprovoked nature of the attack, the prosecutor also reminded the jury that Bryant had testified that he recalled seeing the dogs running loose in front of his mother's home earlier in the evening, and that there was no other person or animal in the vicinity when the dogs attacked her.[3] The circumstances of the dogs' escape from the backyard was also discussed during closing argument. Drawing on Officer Keller's testimony, the prosecutor argued without objection that since the police found the kennel secured while at the same time the dogs were running loose, the jury could conclude that "through negligence, recklessness[, or] . . . an omission by the defendant" the dogs were allowed to run loose and attack Avery. During rebuttal argument, the prosecutor's argument evolved into an assertion that McNeely likely allowed his dogs to run free after he returned from the wedding reception: "What happened that night, ladies and gentlemen[?] The defendant came home with his girlfriend. They put the dogs in the back yard . . . ." Defense counsel objected that there was no evidence to support such an argument. The court sustained the objection, ruling that there was no evidence that upon returning with Simms, McNeely let the dogs out of the kennel thinking that the dogs would remain in the yard. No curative jury instruction was requested or given. Later in rebuttal, the prosecutor said:

Should the defendant be criminally responsible? The District Council government has already determined the answer to be "yes." If you find that he did know he owned pit bulls and they got out and they hurt somebody without provocation, the answer is "yes." You only need to read the newspaper and use your common sense to know why. The Court interjected *sua sponte:* "You cannot read the newspaper. You cannot read the newspaper . . . . Disregard the comment you only need to read the newspaper." The trial court denied McNeely's ensuing motion for a mistrial, preferring instead to give an immediate curative instruction and to remind the jury later during final instructions that they could not rely on what they read in the newspapers to decide the case.

After the jury reached its verdicts of guilt, the trial court asked counsel to brief the issue of improper argument by the prosecutor in closing so that the court could revisit the matter at sentencing. After taking the issue under advisement, the judge denied at sentencing defense counsel's motion for a new trial. The court agreed that the prosecutor's newspaper comment was "grossly improper," but it also determined that its *sua sponte* interjection required harmless error analysis. Given the "low standard of proof" and the strength of the government's case, the court ruled that the prosecutor's unwarranted comment was harmless. After lis-

---

**3.** The record vaguely suggests that there may have been a third dog. Prosecution witness Tony Queen, an animal control officer with the WHS who was called to the scene, testified that he was familiar with the facts of this case because "there was also a third dog—" It is unclear whether this dog was present at the scene of the attack, McNeely's home, or simply impounded elsewhere in the city because Queen's testimony was interrupted by a bench conference in which the prosecutor informed the court that Queen was about to testify that

"there was a third dog that was not owned by the defendant that was taken in . . . to see if it was related to these two dogs and they [animal control] found that it wasn't. So[,] . . . [the government is] not claiming the third dog was in any way related to these—was owned by the defendant." Simms also refers to the presence of what may have been a third "black and white" dog by the name of "Mattie" in the backyard at 79 Q Street, perhaps owned by McNeely.

tening to the parties sentencing requests,[4] the trial court sentenced McNeely to: (1) eight to twenty-four months concurrent terms of imprisonment, with execution of the sentence suspended; (2) three years of supervised probation; (3) 150 hours of community service; and (4) a fine of $5,000 payable in monthly installments of $100. This appeal timely followed.

## II.

The Council enacted the first legislation in this jurisdiction to regulate dangerous dogs in 1988. *See generally* D.C. Act 7–190, D.C. Reg. 35–4787, *codified at*

D.C.Code §§ 6–1021.1—6–1021.8 (1995). This law continues to apply today.[5] Any dog that "[h]as bitten or attacked a person or domestic animal without provocation," or "[i]n a menacing manner, approaches without provocation any person or domestic animal as if to attack, or has demonstrated a propensity to attack without provocation or otherwise to endanger the safety of human beings or domestic animals," is a "dangerous dog" within the meaning of the statute. D.C.Code § 6–1021.1(1)(A)(i) & (ii). Once a dog has been classified as "dangerous" after a hearing conducted before the Mayor, *see* D.C.Code § 6–1021.2,[6] the owner must, in addition to

---

4. Referring to the Act's "dubious constitutionality" and the absence of any prior convictions, defense counsel urged the trial judge to impose probation with a requirement that McNeely refrain from ever owning a pit bull again. The prosecutor agreed with defense counsel's suggestion that probation was appropriate and added a request that the court order McNeely to pay restitution. The government also urged the court to impose a "lengthy probation" period, in part, because of the seriousness of other unrelated prior incidents involving McNeely's dogs—incidents that the judge excluded from the evidence at trial. *See Caldwell v. United States*, 595 A.2d 961, 966 (D.C.1991) (explaining that a sentencing judge may consider any evidence, "including that which was not introduced at trial," provided it is not based on "material false assumptions") (internal quotations omitted). The prosecutor stated that there

> were the prior attacks that this defendant owned dogs that was [sic], that did attack other people and in fact, one of the dogs involved in this case, the one that was hatched [sic], Bruno, had just about three months prior to had attacked somebody and Animal Control had to respond. The defendant owns another dog that was attacked a person [sic] and when a police officer went out to investigate the dog attacked the officer and the officer shot and killed that dog. And that was approximately, I think that was four or five months to [sic] this incident. In addition to that there were a couple of other attacks, Your Honor,

and they were dogs that belonged to the defendant.

5. The law is currently codified at §§ 8–1901 to –1908 (2001). We use in the opinion the previous code sections, which were in effect at the time the offense occurred.

6. Section 6–1021.2, entitled "Determination of a dangerous dog," provides as follows:

> (a) If the Mayor has probable cause to believe that a dog is a dangerous dog, the Mayor may convene a hearing for the purpose of determining whether the dog in question shall be declared a dangerous dog and to determine if the dog would constitute a significant threat to the public health and safety if returned to its owner. Prior to a hearing, the Mayor shall conduct or cause to be conducted an investigation and shall provide reasonable notification of the hearing to the owner.
> (b) Following notice to the owner and prior to the hearing, if the Mayor has probable cause to believe that a dog is a dangerous dog and may pose an immediate threat of serious harm to human beings or other domestic animals, the Mayor may obtain a search warrant pursuant to Rule 204 of the District of Columbia Superior Court Rules of Civil Procedure and impound the dog pending disposition of the case. The owner of the dog shall be liable to the District for the costs and expenses of keeping the dog.
> (c) The hearing shall be held within no less than 5, and no more than 10 days, excluding holidays, Saturdays and Sundays, after

complying with universally applicable licensing obligations, *see* D.C.Code § 6-1004 (1995), specially register his or her dog as a dangerous dog, *see* D.C.Code § 6-1021.4,[7] and fulfill special responsibilities that apply only to owners of dangerous dogs. *See* D.C.Code § 6-1021.5.[8] Violation

service of notice upon the owner of the dog. The hearing shall be informal and open to the public. The owner shall have the opportunity to present evidence as to why the dog should not be declared a dangerous dog or not determined to be a significant threat to the public health and safety if returned to its owner. The Mayor may decide all issues for or against the owner of the dog regardless of whether the owner fails to appear at the hearing.

(d) Within 5 days after the hearing, the owner shall be notified in writing of the determination by the Mayor.

(e) If the owner contests the determination, the owner may, within 5 days of the determination, bring a petition in the Superior Court of the District of Columbia seeking de novo review of the determination. A decision by the Superior Court of the District of Columbia shall not affect the Mayor's right to later declare a dog to be a dangerous dog or to determine that the dog constitutes a threat to the public health and safety, for any subsequent actions of the dog.

7. Section 6-1021.4, entitled "Dangerous dog registration requirements," states that:

The Mayor shall issue a certificate of registration to the owner of a dangerous dog if the owner establishes to the satisfaction of the animal control agency that:

(1) The owner of the dangerous dog is 18 years of age or older;

(2) A valid license has been issued for the dangerous dog pursuant to District law;

(3) The dangerous dog has current vaccinations;

(4) The owner of the dangerous dog has the written permission of the property owner where the dangerous dog will be kept;

(5) The owner of the dangerous dog has a proper enclosure to confine the dangerous dog;

(6) The owner of the dangerous dog has posted on the premises a clearly visible written warning sign that there is a dangerous dog on the property with a conspicuous warning symbol that informs children of the presence of a dangerous dog;

(7) The owner of the dangerous dog has secured a policy of liability insurance issued by an insurer qualified under District law in the amount of at least $50,000 insuring the owner for any personal injuries inflicted by the dangerous dog and containing a provision requiring the District to be named as an additional insured for the sole purpose of requiring the insurance company to notify the District of any cancellation, termination, or expiration of the liability insurance policy;

(8) The dangerous dog has been presented to the appropriate agency to be photographed for identification purposes; and

(9) The owner has paid an annual fee in an amount to be determined by the Mayor, in addition to regular dog licensing fees, to register the dangerous dog.

8. Section 6-1021.5, entitled "Dangerous dog owner responsibility," provides as follows:

It shall be unlawful for the owner of a dangerous dog in the District to:

(1) Keep a dangerous dog without a valid certificate of registration issued under § 6-1021.4;

(2) Permit the dangerous dog to be outside the proper enclosure unless the dangerous dog is under the control of a responsible person and is muzzled and restrained by a substantial chain or leash, not exceeding 4 feet in length. The muzzle shall be made in a manner that will not cause injury to the dangerous dog or interfere with its vision or respiration but shall prevent it from biting any human being or animal;

(3) Fail to notify the Mayor within 24 hours if a dangerous dog is on the loose, is unconfined, has attacked another animal, has attacked a human being, has died, has been sold, or has been given away. If the dangerous dog has been sold or given away the owner shall also provide the Mayor with the name, address, and telephone number of the new owner of the dangerous dog;

(4) Fail to maintain the liability insurance coverage required under § 6-1021.4;

(5) Fail to surrender a dangerous dog to the Mayor for safe confinement pending a disposition of the case when there is a reason to believe that the dangerous dog is a significant threat to the public health and safety; or

(6) Fail to comply with any special security or care requirements established by the Mayor pursuant to § 6-1021.3.

of any of these heightened duties may result in a fine not to exceed $300 for a first offense and $500 for a second offense. *See* D.C.Code § 1021.6(a). In addition, "[a]n owner of a dangerous dog that causes serious injury to or kills a human being or a domestic animal without provocation shall be fined up to $10,000." D.C.Code § 6–1021.6(b).

This statutory framework was temporarily amended on an emergency basis in 1996 by the Pit Bull Act, pursuant to which McNeely was convicted.[9] In relevant part, the Act added the pit bull breed—as defined by either the American Kennel Club or the United Kennel Club—to the definition of a dangerous dog.[10] *See* sec. 2(a), 43 D.C.Reg. at 2156. It further excepted all pit bulls from the provisions of D.C.Code §§ 6–1021.2 and 6–1021.3, thus removing the need for an administrative hearing in order to classify any particular pit bull as a dangerous dog. *See* sec. 2(b), 43 D.C.Reg. at 2156. A new provision was added to allow the Mayor to impound and humanely destroy any pit bull found within the District which had not been licensed and specially registered under D.C.Code § 6–1021.4, unless the owner provided sufficient evidence to prove in an administrative hearing either that the dog was in fact not a pit bull, or that the pit bull would be permanently removed from the District of Columbia. *See* sec. 2(c), 43 D.C.Reg. at 2157. Most pivotal to this case is the Act's amendment of the penalty provisions of

D.C.Code § 6–1021.6. While excepting all owners of pit bulls from civil fines arising from technical violations of the special registration provisions,[11] *see* sec. 2(f)(1), 43 D.C.Reg. at 2158, the Pit Bull Act substantially augmented the penalty imposed upon an owner when a pit bull causes injury to another person or domestic animal:

> [a] pit bull or a Rottweiler that causes injury to or kills a human being or a domestic animal without provocation shall be humanly [sic] destroyed and the owner of such dog shall be fined up to $20,000 and may be sentenced to not more than 2 years of imprisonment.

43 D.C.Reg. at 2158. It was under this particular provision that McNeely was convicted and sentenced.

### III.

McNeely asserts that the Pit Bull Act denies due process of law because it fails to provide "fair warning" of the conduct it proscribes and because it constitutes an impermissible strict liability felony. The government disagrees with the former claim because the Act's penalty provision expressly provides constitutionally adequate notice of the conditions under which criminal liability may attach. The government responds to the second claim by arguing that strict liability statutes imposing criminal sanctions are, as a constitutional matter, permissible, and, that as a matter of statutory interpretation, the common

---

9. The Pit Bull Act was effective for only ninety days, and has not been re-enacted. *See* D.C.Code § 1–229(a) (1999) (defining the permissible term of emergency legislation). Given its emergency and temporary status, the Act is unaccompanied by legislative history, and the present case appears to be the only prosecution brought under it. In addition, we have not heretofore considered an appeal concerning the penalty provision of the dangerous dog law, either as it exists today or as it stood temporarily amended.

10. Although the Act applies equally to Rottweilers, we refer primarily to pit bulls throughout this opinion as that is the breed involved in this case.

11. It appears that such civil fines were supplanted by the Mayor's new authority under the Pit Bull Act to humanely destroy or deport any pit bull found without proper registration.

law presumption in favor of imposing a *mens rea* requirement where a statute is otherwise silent does not permit the court to read into the statute an intent requirement that cannot be reconciled with the Council's obvious purpose. Mindful that the "definition of the elements of a criminal offense is entrusted to the legislature," *Liparota v. United States,* 471 U.S. 419, 424, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985), and that "a strong presumption of constitutionality inheres in legislative enactments" not easily overborne by a challenging party, *In re W.T.L.,* 656 A.2d 1123, 1131 (D.C.1995) (citing *Cobb v. Bynum,* 387 A.2d 1095, 1097 (D.C.1978)), we conclude that the Pit Bull Act is sufficiently definite to comport with the demands of the Constitution's Due Process Clause and that the Council created through the Act a constitutional strict liability felony, without requiring a culpable state of mind, so long as it is proved that the defendant knew he or she owned a pit bull.[12]

### A. *Standing*

■ McNeely presses his "fair warning" claim on appeal in general terms without reference to any of the particular circumstances of his case. We therefore assume that he raises a facial challenge to the Pit Bull Act's constitutionality. A "facial" challenge to a statute alleges that the law is "invalid *in toto*—and therefore incapable of any valid application . . . ." *Steffel v. Thompson,* 415 U.S. 452, 474, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); *see also City of Chicago v. Morales,* 527 U.S. 41, 55 n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (explaining that a party mounting a facial challenge "seeks to vindicate not only his own rights, but those of others who may also be adversely impacted by the statute in question"). Because this form of objection to an assertedly vague legislative enactment implicates the rights of third parties not present before the court, we address a threshold matter of prudential third party standing, which depends upon the substantive doctrine undergirding the claim of error. Although McNeely's constitutional challenge is cast in general terms, the Supreme Court has recognized at least two bases for a facial challenge to a statute.

■ "First, the overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'" *Morales,* 527 U.S. at 52, 119 S.Ct. 1849 (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 612–15, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). We have accordingly held that, in order for a party challenging a statute as overly-broad to have prudential standing, the statute must implicate First Amendment concerns. *See German v. United States,* 525 A.2d 596, 605 (D.C.1987) (citing *New York v. Ferber,* 458 U.S. 747, 767–68, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982); *Broadrick,* 413 U.S. at 613, 93 S.Ct. 2908). McNeely asserts that the Act does not give fair warning because it too broadly criminalizes pit bull ownership, the evidence of which is a series of unrelated hypothetical situations detailed in his brief in which application of the Pit Bull Act would have "surprisingly"

---

12. Genuine strict liability does not require that a defendant know the facts underlying criminal liability, in this case, ownership of pit bulls. *See Staples,* 511 U.S. at 607 n. 3, 114 S.Ct. 1793. By requiring this baseline knowledge we avoid application of the most rigorous form of strict liability. *See id.* However, to be consistent with both McNeely's claim on appeal, as well as the broader and more popularly understood meaning of strict liability, *i.e.,* the absence of a culpable mental state, we continue in this opinion to employ the strict liability rubric. *See id.*

untoward results. Because dog ownership is a form of property interest not protected by the First Amendment, *see Nicchia v. New York*, 254 U.S. 228, 230, 41 S.Ct. 103, 65 L.Ed. 235 (1920) ("Property in dogs is of an imperfect or qualified nature and they may be subjected to peculiar and drastic police regulations by the State without depriving their owners of any federal right."); *cf. State v. Peters*, 534 So.2d 760, 763–64 (Fla.Dist.Ct.App.1988) ("Where there is no fundamental right or suspect class at issue—as here, where the classification concerns animals—courts will usually uphold the constitutionality of the law."), McNeely lacks prudential standing to raise an overbreadth challenge.

▮ The vagueness doctrine forms a second potential basis for a facial challenge to a statute where, "even if [the] enactment does not reach a substantial amount of constitutionally protected conduct, ... it [nonetheless] fails to establish standards for the police ... that are sufficient to guard against the arbitrary deprivation of liberty interests," *Morales*, 527 U.S. at 52, 119 S.Ct. 1849, or it "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits." *Id.* at 56, 119 S.Ct. 1849. McNeely's fair warning claim falls within the latter category. Whereas the absence of First Amendment concerns renders an overbreadth claim non-justiciable under

notions of prudential third party standing, a vagueness claim not implicating the First Amendment remains cognizable, but only as applied to the facts of the case presented. *See Chapman v. United States*, 500 U.S. 453, 467, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) (citing *United States v. Powell*, 423 U.S. 87, 92, 96 S.Ct. 316, 46 L.Ed.2d 228 (1975) ("[i]t is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand") (quoting *United States v. Mazurie*, 419 U.S. 544, 550, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975))). We therefore turn to the merits of McNeely's fair warning argument as an applied challenge to the constitutional vagueness of the Pit Bull Act.

### B. *Vagueness Challenge*

▮ The Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution have been construed as requiring that notice be given of the conduct proscribed by criminal statutes.[13] *See, e.g., Colten v. Kentucky*, 407 U.S. 104, 110, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972). To enforce this guarantee, courts have adopted a "void-for-vagueness" doctrine, which "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited ...." [14]

13. "Notice" in this context refers to the objective intelligibility of the law's content to a reasonable person rather than the claimant's subjective awareness and understanding. *See, e.g., Lyng v. Payne*, 476 U.S. 926, 942, 106 S.Ct. 2333, 90 L.Ed.2d 921 (1986) (holding that publication of legislative enactments, in this case, regulations governing disaster relief loans that had been published in the Federal Register, presumptively satisfies procedural due process of law governing notice).

14. The Supreme Court has recently explained that several related analytical tools fall under

the doctrinal umbrella protecting citizens against statutory vagueness:

There are three related manifestations of the fair warning requirement. First, the vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application. Second, as a sort of "junior version of the vagueness doctrine," the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal

*Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *accord United States v. Smith,* 685 A.2d 380, 384 (D.C.1996); *Chemalali v. District of Columbia,* 655 A.2d 1226, 1230 (D.C.1995). "Sufficient definiteness" is an elastic concept. Where criminal penalties are at stake, the constitutionally tolerable limits of statutory imprecision contract and a relatively strict vagueness test is appropriate. *See Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498–99, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (explaining the Constitution permits a greater degree of imprecision in a civil statute than in a criminal statute) (citing *Barenblatt v. United States,* 360 U.S. 109, 137, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959)) (Black, J., with whom Warren, C.J., and Douglas, J., joined, dissenting)); *Winters v. New York,* 333 U.S. 507, 515, 68 S.Ct. 665, 92 L.Ed. 840 (1948)). Whatever the level of scrutiny, however, a statute is not unconstitutionally vague even if it requires that a person's conduct conform to a some-

what amorphous—yet comprehensible—standard; it is unconstitutionally vague only if "no standard of conduct is specified at all." *Tuck v. United States,* 467 A.2d 727, 731 (D.C.1983) (internal quotation marks omitted) (quoting *Coates v. City of Cincinnati,* 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971)). Therefore, it is well established that "a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits ...." [15] *Morales,* 527 U.S. at 56, 119 S.Ct. 1849 (citing *Giaccio v. Pennsylvania,* 382 U.S. 399, 402–403, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966)).

 McNeely fails to identify any imprecision in the express language of the Pit Bull Act that deprives him of fair warning of the proscribed conduct. Examining it ourselves, we observe that the Pit Bull Act specifically and unambiguously imposes liability on the owner of a pit bull or Rottweiler that attacks and causes injury without provocation. By focusing on (1)

statute as to apply it only to conduct clearly covered. Third, although clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope. In each of these guises, the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.
*United States v. Lanier,* 520 U.S. 259, 266–67, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (internal quotation marks and citations omitted).

15. McNeely argues that our analysis of his fair warning claim is governed by *Liparota,* 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985), which he understands as announcing a strand of constitutional vagueness doctrine applicable when a statute "provides no notice where it purports to regulate widespread, innocent conduct ...." The discussion in *Liparota* to which he cites, however, explicates the

Court's reasoning in adhering to the common law presumption favoring statutory interpretations requiring *scienter* where the legislature has otherwise been silent. 471 U.S. at 426–27, 105 S.Ct. 2084. See section III.D, *infra.* Contrary to McNeely's suggestion, the Court did not rely on the ubiquitous nature of the regulated conduct in order to strike down the statute as unconstitutionally vague. The broad reach of a statute does not necessarily render its terms indefinite for purposes of the void-for-vagueness doctrine. The Court's express observation that neither party challenged the statute at issue as being unconstitutional, *see id.* at 424 n. 6, 105 S.Ct. 2084, assures us that *Liparota* cannot lend support to McNeely's constitutional claim. We note that, even as a matter of statutory interpretation, the Court made clear in *Liparota* that, where a statute may criminalize a broad range of apparently innocent conduct, the legislature, with adequate expression of purpose, "*could* have intended this broad range of conduct be made illegal." *Id.* at 427, 105 S.Ct. 2084.

the ownership of (2) two specific breeds, (3) unprovoked attacks, and (4) injury in fact, the Act criminalizes a narrow range of conduct that is easily understood. McNeely complains that the Act subjects owners of pit bulls to criminal liability "without regard to any behavior that they could take to avoid violating the law." We do not agree because the plain, non-technical language of the Act's penalty provision clearly indicates that ownership of pit bulls is highly disfavored in the District of Columbia and that desisting in such ownership is the most immediately available and effective recourse to avoiding criminal liability. The wording of the Act is thus not lacking in fair warning such "that men of common intelligence must necessarily guess at its meaning and differ as to its application . . . ." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926).

■ McNeely nonetheless asserts that the Pit Bull Act is unconstitutionally vague because it imposes criminal liability without regard to fault. Although the absence of a *scienter* requirement may be a factor considered when testing a statute for constitutional vagueness, *see, e.g., Colautti v. Franklin*, 439 U.S. 379, 395, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979) ("This Court has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea*.") (citing, *inter alia, United States v. Ragen*, 314 U.S. 513, 524, 62 S.Ct. 374, 86 L.Ed. 383 (1942) (stating that in the absence of a *scienter* requirement, a statute may become little more than "a trap for those who act in good faith")), the absence of a *scienter* requirement is not a sufficient basis to strike a legislative enactment as unconstitutionally vague. Rather, the absence of a *scienter* requirement may be weighed in determining that the express

language of a statute is void for vagueness, while the presence of a *scienter* requirement may save a statute from invalidation despite the apparent vagueness of its wording. *See Hoffman*, 455 U.S. at 499, 102 S.Ct. 1186 ("a *scienter* requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed") (citing *Screws v. United States*, 325 U.S. 91, 101–03, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) (plurality opinion) ("[the] requirement of a specific intent to do a prohibited act may avoid those consequences to the accused which may otherwise render a vague or indefinite statute invalid . . . . The requirement that the act must be willful or purposeful may . . . relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware")). We find no support for McNeely's assertion that the strict liability nature of the Pit Bull Act renders it inherently void for vagueness—a proposition made plainly untenable by the fact that strict liability offenses are constitutionally enforced in the laws of this jurisdiction and across the nation. *See* section III. C, *infra*.

Finally, McNeely draws our attention to *Lambert v. California*, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957), where the Court considered the validity, under the Due Process Clause of the Fourteenth Amendment, of an ordinance that made it a criminal offense for a convicted felon to remain in the city of Los Angeles for five days without registering with the chief of police. The Court invalidated the statute as it applied to Lambert, holding that

actual knowledge of the duty to register or proof of the probability of such knowledge and subsequent failure to comply are necessary before a conviction under the ordinance can stand. As Holmes wrote in THE COMMON LAW, "A law which punished conduct which

would not be blameworthy in the average member of the community would be too severe for that community to bear." *Id.* at 229, 78 S.Ct. 240. The Court drew this conclusion for two reasons. First, the ordinance punished wholly passive conduct, that is to say, "[v]iolation of its provisions [was] unaccompanied by any activity whatever, mere presence in the city being the test." *Id.* Second, "circumstances which might move one to inquire as to the necessity of registration [were] completely lacking." *Id.* Because physical presence within a city is presumptively innocent, the Court reasoned that there was no "commission of acts, or the failure to act under circumstances that should alert the doer to the consequences of his deed." *Id.* at 228. *Lambert* is thus a rare instance in which the Supreme Court has held that, contrary to the well-established tenet that ignorance of the law is not a defense to criminal prosecution, *see Cheek v. United States,* 498 U.S. 192, 199, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991), actual knowledge of the law is a prerequisite to criminal liability.

■ McNeely contends that the Pit Bull Act is similar to the ordinance in *Lambert* because it subjects to criminal prosecution an individual engaged in otherwise innocent conduct—ownership of pit bulls. But, as we have already discussed, the Pit Bull Act more limitedly criminalizes ownership of pit bulls that cause serious injury or death to a human being or another domestic animal. The temperament of pit bulls, particularly their volatile capacity for hostility and violent behavior, is sufficiently well-known that these dogs are "proper subject[s] of regulatory measures adopted in the exercise of a state's 'police power ....' "[16] *McIntosh v. Washington,* 395 A.2d 744, 756 (D.C.1978) (citing

*United States v. Inter'l Minerals & Chems. Corp.,* 402 U.S. 558, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971) (corrosive liquids); *United States v. Freed,* 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971) (grenades); *United States v. Balint,* 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922) (narcotics); *United States v. Dotterweich,* 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943) (adulterated and misbranded drugs)). Moreover, unlike in *Lambert,* McNeely's undisputed knowledge that his dogs were pit bulls should have moved him to inquire into his heightened obligations under the Act. *See Lambert,* 355 U.S. at 229, 78 S.Ct. 240. Where such characteristically dangerous dogs are knowingly owned, "the probability of regulation is so great that anyone who is aware that he is either in possession of or dealing with them must be presumed to be aware of the regulation." *McIntosh,* 395 A.2d at 756 (citing *Shevlin–Carpenter Co. v. Minnesota,* 218 U.S. 57, 64–65, 30 S.Ct. 663, 54 L.Ed. 930 (1910)). Moreover, it appears that McNeely had previous experience with the dangerous propensities of his dogs that had brought him in contact with the Washington Humane Society and the police. See *supra* note 4. McNeely was thus, at least, on inquiry notice of his obligations under the Pit Bull Act and he cannot avail himself of *Lambert.*

■ We have also taken into account that the Pit Bull Act which was enacted as emergency legislation, greatly augmented the liability attaching to McNeely's existing ownership of pit bulls, and might have come as an "unfair surprise." Specifically, the immediately effective emergency enactment of the Pit Bull Act on April 16, 1996, and the occurrence of the May 13 attack on Avery afforded McNeely twenty-

---

**16.** As noted by the government and acknowledged by the pre-trial motions judge, District

residents reported 81 pit bull bites in 1994 out of a total of 477 reported animal bites.

seven days to familiarize himself with the penalty provision and to decide whether he would accept the risk of criminal liability by continuing to own two pit bulls housed in the District of Columbia. Barring disapproval by Congress, Council legislation creating criminal offenses under Title 22 of the D.C.Code ordinarily takes effect sixty days after the Chair of the Council transmits the act to the Speaker of the U.S. House of Representatives and the President of the U.S. Senate. *See* D.C.Code § 1–233(c)(2) (1999). McNeely thus had thirty-three fewer days than in the case of non-emergency legislation to take note of the amendment to the dangerous dog statute. The Supreme Court has stated that the presumption charging citizens with knowledge of the law arguably "may be overcome in cases in which the statute does not allow a sufficient 'grace period' to provide the persons affected by a change in the law with an adequate opportunity to become familiar with their obligations under it." *Atkins v. Parker*, 472 U.S. 115, 130, 105 S.Ct. 2520, 86 L.Ed.2d 81 (1985); *see also United States v. Locke*, 471 U.S. 84, 108, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985) ("[A] legislature generally provides constitutionally adequate process simply by enacting the statute, publishing it, and, to the extent the statute regulates private conduct, affording those within the statute's reach a reasonable opportunity both to familiarize themselves with the general requirements imposed and to comply with those requirements."). In this case, even though the usual legislative grace period was reduced by half, the amendment to the statute had been in effect almost four weeks before its sanction fell on McNeely. We take note that the longer grace period usually afforded by the legislative process in the District of Columbia is unusual due to the unique feature of a Congressional layover period. McNeely's fair warning argument is presented in the most general manner, and does not reveal whether he was personally prejudiced by the rapid development in the District's dangerous dog law.[17] On this record, we cannot say that McNeely has carried his burden in challenging that the period provided by enactment of the Pit bull Act on an emergency basis did not, in his case, comport with due process of law.

## C. *The Constitutionality of a Strict Liability Felony*

McNeely asserts that, separate and apart from vagueness, the Pit Bull Act violates the Due Process Clause because it is a strict liability felony.[18] A great weight of case law rejects the notion that there is a constitutional bar to strict liability crimes or a prohibition against imprisonment for conviction on a strict liability basis.[19] Strict liability criminal offenses—

---

17. It might be that the new sanction did not come as a surprise to McNeely who, as noted previously, had dealt with both animal protection and police authorities in connection with his dogs. See *supra* note 4.

18. McNeely's counsel stated in oral argument that the language of the statute does not permit this court to interpret the statute in such a way as to impose what McNeely would consider an adequate *scienter* requirement, and contended that without such a requirement the statute was unconstitutional. We discuss here the constitutional argument, and subsequently consider the interpretive issue.

19. *See, e.g., Powell v. Texas*, 392 U.S. 514, 535–36, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968) (stating that the Court has never adopted a constitutional doctrine of *mens rea*, leaving negotiation of such issues to the states); *Chicago, Burlington, & Quincey Ry. v. United States*, 220 U.S. 559, 578, 31 S.Ct. 612, 55 L.Ed. 582 (1911) ("The power of the legislature to declare an offense, and exclude the elements of knowledge and due diligence from any inquiry as to its commission, cannot, we think, be questioned."); *United States v. Engler*, 806 F.2d 425, 433 (3d Cir.1986) ("It is well established that a criminal statute is

including felonies—are not unprecedented in the District of Columbia; the Council has enacted several such statutes in the past.[20] Moreover, this court has upheld the Council's constitutional authority to do so. *See, e.g., Harris v. United States*, 162 A.2d 503, 505 (D.C.1960) (stating that "it is now too settled to doubt that the legislature may dispense with intent as an element of criminal liability when the regulation is in the exercise of the police power for the benefit of the people"); *accord Commonwealth v. Koczwara*, 188 Pa.Super. 153, 146 A.2d 306, 308 (1958); *Kirkham v. City of North Little Rock*, 227 Ark. 789, 301 S.W.2d 559, 563–64 (1957); *People v. Darby*, 114 Cal.App.2d 412, 250 P.2d 743, 754 (1952); *People v. Cramer*, 247 Mich. 127, 225 N.W. 595, 598 (1929); *State v. Striggles*, 202 Iowa 1318, 210 N.W. 137, 138 (Iowa 1926).

These precedents, moreover, are consistent with the Supreme Court's acknowledgment that "conduct alone without regard to the intent of the doer is often sufficient" to constitute a crime because lawmakers have "wide latitude ... to declare an offense and to exclude elements of knowledge and diligence from its definition." *Lambert*, 355 U.S. at 228, 78 S.Ct. 240. This latitude is justified in the interest of the "larger good ... [which] puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger." *Morissette v. United States*, 342 U.S. 246, 260, 72 S.Ct. 240, 96 L.Ed. 288 (1952) (quoting *Dotterweich*, 320 U.S. at 281, 64 S.Ct. 134); *see also United States v. Park*, 421 U.S. 658, 674, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975).

▆ Thus, a statute defining an offense *malum prohibitum* may impose a fine and/or imprisonment on a strict liability basis without offending due process of law. Our conclusion is supported by the accepted proposition that "[t]he accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities."[21] *Morissette*, 342 U.S. at 256, 72 S.Ct. 240.

not necessarily unconstitutional because its definition of a felony lacks the element of scienter.") (citing cases); *United States v. Greenbaum*, 138 F.2d 437, 438 (3d Cir.1943) ("The Constitutional requirement of due process is not violated merely because mens rea is not a required element of a prescribed crime."); *Owens v. State*, 352 Md. 663, 724 A.2d 43, 49 (1999) ("Appellant finds little support in any Court of Appeals or United States Supreme Court decision for the proposition that a mental element is constitutionally required for criminal liability, even when substantial penalties are involved."), *cert. denied*, 527 U.S. 1012, 119 S.Ct. 2354, 144 L.Ed.2d 250 (1999); *State v. Maldonado*, 137 N.J. 536, 645 A.2d 1165, 1171 (1994) (upholding the constitutionality of a statute that imposed strict criminal liability on manufacturers and distributors of certain controlled dangerous substances that cause death when ingested); *cf. Staples*, 511 U.S. at 618, 114 S.Ct. 1793 (cautioning that as a matter of statutory interpretation offenses not requiring *mens rea* are generally disfavored).

**20.** *See, e.g.,* D.C.Code § 6–751.18 (Supp.2000) (strict liability misdemeanor for unlawful pesticide operations); § 6–997.12 (Supp.2000) (strict liability misdemeanor for unlawful use of lead-based paints); § 22–3214(a) (1996) (strict liability misdemeanor for unlawful possession of a sawed-off shot gun authorizing not more than one year imprisonment); § 6–2311(a) (1995 & Supp.2000) (strict liability misdemeanor for failure to register a firearm); § 22–3204(a) (1996) (strict liability misdemeanor for carrying a pistol without a license with exceptions that can make it a felony); § 6–2912(b)(2) (Supp.2000) (strict liability felony for unlawful solid waste disposal for commercial purposes).

**21.** As discussed below, however, affirmative defenses may be available where circumstances allow no choice but to run afoul of the statute.

## D. Statutory Interpretation

As a corollary to his contention that, as a strict liability felony the Pit Bull Act is unconstitutional, McNeely argues that the trial court could not interpret the Pit Bull Act as including a *scienter* requirement in order to ameliorate what he contends is its illicit strict liability character.[22] The court imputed two elements of *scienter* to the statute: (1) whether the accused knew he owned the dog, and (2) whether the accused knew the dog he owned was a pit bull. We hold that the trial court's interpretation preserves the Act's strict liability nature, see note 12, *supra*, and thus comports with the legislature's intent.

 We review *de novo* issues of statutory interpretation. *See Porter v. United States*, 769 A.2d 143, 148 (D.C. 2001); *District of Columbia v. Jerry M.*, 717 A.2d 866, 868 (D.C.1998). "A cornerstone of statutory interpretation is the rule that a court 'will not look beyond the plain meaning of a statute when the language is unambiguous and does not produce an absurd result.'" *J. Frog, Ltd. v. Fleming*, 598 A.2d 735, 738 (D.C.1991) (quoting *Gibson v. Johnson*, 492 A.2d 574, 577 (D.C. 1985)); *see also Peoples Drug Stores v. District of Columbia*, 470 A.2d 751, 753 (D.C.1983) (en banc). "It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the law-making body which passed it, the sole function of the courts is to enforce it according to its terms .... Where the language is plain and admits of no more than one meaning, the duty of interpretation does not arise." *United States v. Young*, 376 A.2d 809, 813 (D.C.1977) (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)).

 The language of the statute before us is plain and direct. As its full title indicates, the Pit Bull and Rottweiler Dangerous Dog Designation Emergency Amendment Act of 1996 specifically identifies both pit bulls and Rottweilers as dangerous dogs. The unique treatment of these dogs is made clear from their designation as dangerous *per se*, which is quite distinct from the way in which other dogs are treated under the statute. See *supra* note 6. The meaning of the statute is unambiguous, setting forth a criminal penalty for specifically proscribed conduct, *i.e.*, ownership of a pit bull or Rottweiler that unprovokedly attacks: "A pit bull or a Rottweiler that causes injury to or kills a human being or a domestic animal without provocation shall be humanly [sic] destroyed and the owner of such dog shall be fined up to $20,000 and may be sentenced to not more than 2 years of imprisonment." 43 D.C.Reg. 2158. This result is not only not absurd, but reflects a legitimate legislative judgment that owners of certain dogs—well known to be potentially dangerous animals—should be held criminally accountable for serious injury caused by dogs over which they voluntarily assumed ownership and control. *See Morissette*, 342 U.S. at 256, 72 S.Ct. 240; *see also* Model Penal Code (U.L.A.) § 2.06(2)(b) (2001) (stating that an individual is legally accountable for the conduct of another person when the code or the law defining the offense so provides).

The required element of ownership—and, by implication, control—are weighty

---

22. Presumably, McNeely's purpose is to make his constitutional attack more effective by precluding the trial court's ameliorated interpretation of the statute. As discussed in the previous section, however, even a purely strict liability criminal statute does not necessarily offend the Constitution.

considerations in our decision. Whether one conceives of the owner's liability under the Pit Bull Act as springing from the fact of ownership or as a variation on traditional vicarious liability, the underlying premise remains the same—an owner is responsible for that which he owns. In *Park*, 421 U.S. at 673 95 S.Ct. 1903, the Court upheld the conviction of a corporation president who stood in responsible relation to those engaged in criminal corporate conduct and who did not show he was "powerless" to prevent it. As the Court noted, "[t]he duty imposed by Congress on responsible corporate agents is, we emphasize, one that requires the highest standard of foresight and vigilance, but the Act, in its criminal aspect, does not require that which is objectively impossible." *Id.* The same is true in the case before us. The liability imposed by the Council upon dog

owners is not, on its face, objectively impossible to avoid.[23]

McNeely argues that the Act should be interpreted applying the common law presumption in favor of requiring a culpable state of mind *scienter* requirement when the express language of a statute is silent on the matter. *See Staples*, 511 U.S. at 606, 625, 114 S.Ct. 1793. The presumption is based on the common understanding of *malum in se* offenses, which traditionally are "generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand." *Morissette*, 342 U.S. at 251, 72 S.Ct. 240. Silence, however, is not always dispositive, and where the legislature is acting in its capacity to regulate public welfare, silence can be construed as a legislative choice to dispense with the *mens rea* requirement.[24] *See id.* at 262, 72

**23.** We are not presented here, and therefore do not reach, situations in which there might be affirmative defenses to strict liability. Because notions of ownership and control underlie strict liability crimes, *see Park*, 421 U.S. at 673, 95 S.Ct. 1903; *Morissette*, 342 U.S. at 256, 72 S.Ct. 240, strict liability might not lie where substantive ownership itself is lacking, or where ownership is substantially vitiated, if the owner no longer stands "in responsible relation to a public danger." *Id.* at 260, 72 S.Ct. 240. As courts have recognized in the context of vicarious liability, for example, there are certain violations which are beyond the owner's control precisely because they occur when an individual is deprived of his capacity to act as owner. In other words, the individual standing in responsible relation to a public danger is made "powerless." *See Park*, 421 U.S. at 673, 95 S.Ct. 1903. *See also United States v. Bailey*, 444 U.S. 394, 409, 100 S.Ct. 624, 62 L.Ed.2d 575 ·(1980) (holding that duress requires a showing that there was no opportunity to refuse the criminal act and avoid the threatened harm); *Stewart v. United States*, 370 A.2d 1374, 1376 (D.C.1977) (holding that duress is available in the presence of a well grounded apprehension of immediate death or serious bodily injury).

For recognized defenses to other strict liability offenses, *see Iowa City v. Nolan*, 239

N.W.2d 102, 105 (Iowa 1976) (holding that a statute making the owner of a vehicle strictly and vicariously liable for all parking citations is constitutional because the burden of rebutting the government's prima facie case simply shifts to the defendant, who may show, for example, that the car was stolen); *cf. City of Campbellsburg v. Odewalt*, 72 S.W. 314, 315 (Ky.1903) (holding that an ordinance imposing criminal sanctions on the person in possession of premises on which alcohol is sold is unconstitutional because the defendant may not affirmatively show that those actually dispensing the alcohol entered the premises without his authority).

**24.** Although the express language of the Act is silent with regard to *scienter*, the structure of the statute as amended is an indication from the Council that pit bulls are to be treated differently from all other dangerous dogs, *see* sec. 2(b), 43 D.C.Reg. at 2156 (making administrative procedures of D.C.Code §§ 6–1021.2 and 6–1021.3 inapplicable to pit bulls), thus implying an intent to impose unique penalties on pit bull owners, evidently including strict liability. *See, e.g., Lanier*, 520 U.S. at 267, 117 S.Ct. 1219 n. 6 (stating that legislative intent is discerned by reference not only to the language of the statute, but its structure as well). This implied statement of legislative intent further supports our conclusion that

S.Ct. 240; *Staples*, 511 U.S. at 607, 114 S.Ct. 1793.

It is worth noting that the interpretative presumption favoring an element of *mens rea*—a concept comprising not just specific intent, but general intent as well—"requires knowledge only of the facts that make the defendant's conduct illegal ...." *Staples*, 511 U.S. at 627 n. 3, 114 S.Ct. 1793 (Ginsburg, J., concurring) (quoting *Cheek v. United States*, 498 U.S. 192, 199, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991)); see *supra* note 12. This is the presumption that the trial court applied in requiring that the defendant know that he owned pit bulls. McNeely, however, considers it insufficient because the common law presumption commends that a culpable mental state be proved.

In *Staples*, the Court identified several considerations, beyond mere statutory silence, which bear upon legislative intent to impose strict liability, including: (1) the contextual rules of the common law; (2) whether the crime can be characterized as a "public welfare offense" created by the legislature;[25] (3) the extent to which a strict liability reading of the statute would seemingly encompass entirely innocent conduct; and (4) the harshness of the penalty. *See Staples*, 511 U.S. at 605–18, 114 S.Ct. 1793. Consideration of these factors leads us to conclude that the Pit Bull Act should be enforced according to the plain meaning of its terms, without imposing a *mens rea* requirement of culpable intent, but with a requirement that the accused know he or she owns a pit bull.

As to the first factor, it is inappropriate to construe the Pit Bull Act in the light of background rules of the common law where such rules no longer apply to the particular offense.

> While the general rule at common law was that the *scienter* was a necessary element in the indictment and proof of every crime, and this was followed in regard to statutory crimes even where the statutory definition did not in terms include it ..., there has been a modification of this view in respect to prosecutions under statutes the purpose of which would be obstructed by such a requirement. It is a question of legislative intent to be construed by the court.

*See also Balint*, 258 U.S. at 251–52, 42 S.Ct. 301; *accord Patton v. United States*, 326 A.2d 818, 820 (D.C.1974); *see also Hutchison Bros.*, 278 A.2d at 321 (stating that "[w]here the peculiar nature of the legislation requires an effective means of regulation, such legislation may dispense with the conventional requirement for criminal conduct, *i.e.*, awareness of some wrongdoing") (citations omitted). We think that the Pit Bull Act falls within that class of statutes the purpose of which would be obstructed by a requirement of proof of culpable intent. Once the legislature has determined that a particular breed poses a heightened danger that justifies a special regime, to require proof that a dog owner purposefully, recklessly, or negligently set his dog upon another would undermine the balance struck by

---

the Pit Bull Act creates a strict liability felony. *See Staples*, 511 U.S. at 606, 114 S.Ct. 1793 (stating that "some indication of congressional intent, express or implied, [apart from a statute's mere silence], is required to dispense with *mens rea* as an element of a crime") (citations omitted).

**25.** This court addressed the meaning of "public welfare offense" in *Hutchison Brothers Ex-*

cavation Co. v. District of Columbia, 278 A.2d 318, 321 n. 7 (D.C.1971) (internal quotation and citation omitted):

> The term, public welfare offense, is used to denote the group of police offenses and criminal nuisances, punishable irrespective of the actor's state of mind, which have been developing in England and America within the past ... century ....

the legislature in the statute. *See Patton,* 326 A.2d at 820.

As to the second factor, the Pit Bull Act is primarily a public welfare offense that regulates potentially harmful or injurious items, not merely a codification of a common law crime.[26]

> In such situations, [the courts] have reasoned that as long as a defendant knows that he is dealing with a dangerous device of a character that places him "in responsible relation to a public danger," he should be alerted to the probability of strict regulation, and we have assumed that in such cases [the legislature] intended to place the burden on the defendant to "ascertain at his peril whether [his conduct] comes within the inhibition of the statute."

*Staples,* 511 U.S. at 607, 114 S.Ct. 1793 (internal citations omitted); *see also Holmes v. District of Columbia,* 354 A.2d 858, 860 (D.C.1976) ("Where, as here, reasonable regulations establish public welfare offenses for the purpose of maintaining the health and safety of those ill equipped to protect themselves, the defenses of good faith or lack of mens rea are unavailable.") (citations omitted). The known potential of pit bulls for dangerous behavior—declared by the legislature in the Act—places an owner in responsible relation to the public danger which his dog may pose. Thus, a pit bull owner is on inquiry notice of a host of regulations pertaining to his dog, including those governing licensing, registration, and general conduct in public. In fact, McNeely's prior interactions with WHS led him to confirm the design specifications of his kennel with the organization's law enforcement program.

The third factor, whether the statute "criminalize[s] a broad range of apparently innocent conduct," we have touched on already in the context of McNeely's constitutional challenges. Dogs in general are not "deleterious devices or products or obnoxious waste materials that put their owners on notice that they stand in responsible relation to a public danger." *Staples,* 511 U.S. at 610–11, 114 S.Ct. 1793 (internal quotations omitted). The Act, however, does not outlaw ownership of all dogs, nor does it generally criminalize the ownership of pit bulls. It specifically criminalizes a narrow range of intelligible and grievous conduct, *i.e.,* ownership of a pit bull *that causes injury without provocation. Cf. id.* (criminalizing mere possession of an unregistered gun).

Lastly, the relative severity of the punishment, a fine of up to $20,000 and imprisonment of up to two years, favors the imposition of a *mens rea* requirement. Although the Court has expressed reluctance in interpreting felonies as strict liability offenses, *see Staples,* 511 U.S. at 618, 114 S.Ct. 1793, it has not created a bright line rule against it, and, in fact, it has expressly so interpreted felony statutes when the statutory language has required it. *See id.* (citing *Balint,* 258 U.S. at 250, 42 S.Ct. 301). The message of the Pit Bull Act's sanction is inescapable; it clearly articulates a legislative judgment on the gravity of the public harm by the very level of punishment exacted, which exceeds that imposed on owners of other dogs that cause injury, even though such owners are subject to a lesser standard. *Compare* 43 D.C.Reg. at 2158 (imposing up to two years of imprisonment and up to $20,000 as fine for death or injury caused by pit bulls) *with* D.C.Code § 6–1021.6(b) (imposing fine of up to $10,000 for death or injury caused by other "dangerous dogs"). Al-

---

**26.** While not controlling, the Act's codification under Title 6 dealing with Health and Safety is some indication that it is considered regulatory in nature.

though there is no legislative history available, it is apparent from the discrepancy in sanction that the severity of potential liability may well have been intended as a disincentive to ownership of pit bulls because of the Council's understanding that they pose a greater risk of serious injury than do other dogs.

Having considered the factors set out in *Staples* for applying the interpretative presumption in favor of imposing a *mens rea* requirement, we read the elements of the offense constrained by the clear language of the statute, which does not indicate a culpable mental state for the offense. Nor do we think such a requirement consistent with the Act's purpose as a public welfare offense based on the dangerous potential of these particular breeds. In view of the importance of the breed of the dog to criminal liability under the Act and the likely deterrent to their ownership built into the statute, however, we also think it clear that, for a conviction to stand, it must be shown that the defendant knew that he or she owned a pit bull, and to this limited extent, we read in a *mens rea* element, not of culpable intent, but of knowledge of the facts that make the conduct illegal. *See Staples*, 511 U.S. at 619, 114 S.Ct. 1793 (requiring under the National Firearms Act that the defendant know that the gun was an automatic weapon).

## IV.

 Finally, we turn to McNeely's claim that the prosecutor's closing and rebuttal arguments were improper. When reviewing an allegation of improper prosecutorial argument, this court first determines whether any of the challenged comments were, in fact, improper. *See Freeman v. United States*, 689 A.2d 575, 584 (D.C.1997). If so, the court must, "viewing the remarks in context, 'consider the gravity of the [impropriety], its rela-

tionship to the issue of guilt, the effect of any corrective action by the trial judge, and the strength of the government's case.'" *Id.* (quoting *McGrier v. United States*, 597 A.2d 36, 41 (D.C.1991)). Where an objection was lodged at trial to a comment that was indeed improper, and where the trial court thus erred in overruling the objection, we will reverse the conviction unless the defendant was not substantially prejudiced by the court's error. *See McGrier*, 597 A.2d at 41. On the other hand, where there was no objection at trial to the prosecutor's comments, the court may reverse only if the trial court's failure, *sua sponte*, to intervene and to prevent the misconduct "so clearly prejudiced" the appellant's substantial rights "as to jeopardize the fairness and integrity of his trial." *Irick v. United States*, 565 A.2d 26, 32 (D.C.1989). Reversal in such cases is confined to "particularly egregious situations" where a miscarriage of justice would result if this court were to stand idly by. *See id.* (citations omitted).

 The prosecutor stated in closing argument, without objection, that McNeely negligently or recklessly released his dogs:

> What you can believe, ladies and gentlemen, is that through negligence, recklessness and after the defendant—an omission by the defendant, those dogs were let loose on the people of southwest D.C. and they found their prey in Miss Helen Avery, and they chewed on her, and they chewed on her.

Assuming that the prosecutor's remark implying negligence was unfounded, the trial court's failure, *sua sponte*, to strike it did not result in a miscarriage of justice. The brief reference to McNeely's negligence was not emphasized as a primary argument nor urged as a legal theory of the case. *See Hunter v. United States*, 606 A.2d 139, 146 (D.C.1992) ("[V]iewing the

offending remarks in the context of the case as a whole, . . . it is most unlikely that a few lines of impermissible comment, to which neither counsel nor the judge again alluded, compromised the fairness or integrity of the entire trial or threatened such a clear miscarriage of justice that the plain error doctrine may properly be invoked.").

The prosecutor also made a more pointed remark, this time over objection, that McNeely intentionally released his dogs: "What happened that night, ladies and gentlemen, the defendant came home with his girlfriend. They put the dogs in the backyard and then let me point out something." While the trial court sustained defense counsel's objection, no curative jury instruction was requested or given. The prosecutor's remark that McNeely purposely released the dogs from the pen may have introduced the issue of fault, but the statements bore little relationship to the issue of guilt which, as we have discussed, was properly based on strict liability. The prosecutor emphasized in his opening statement and the court reemphasized in its instructions to the jury that the only matters which pertained to a determination of guilt were knowing ownership of pit bulls and whether the attack was unprovoked. To the extent the prosecutor's comments suggest-

ed that McNeely's fault was at issue, it increased the government's burden and could have redounded to McNeely's benefit. At worst, the prosecutor's statements may have distracted the jury's attention from the sole disputed issue of provocation, but on this record we do not believe that the prosecutor's statements prejudiced the defendant in any meaningful way.

Lastly, the prosecutor stated in rebuttal argument: "Should the defendant be held criminally responsible? The District council government has already determined that answer to be yes. You only need to read the newspaper and use your common sense to know why." The trial court interrupted *sua sponte*, declaring to the jury that "[y]ou cannot read the newspaper. You cannot read the newspaper .... Disregard the comment that you only need to read the newspaper." While the trial court deemed the prosecutor's statement "grossly improper," an assessment with which we agree, we conclude that the prosecutor's remark was rendered harmless by the trial court's two clear and strongly worded curative instructions. The first occurred immediately after the prosecutor's comment[27] and the second occurred in the context of final instructions later that day.[28] The jury is pre-

---

**27.** The trial court immediately gave the following curative instruction:

> There was a reference with the newspaper, that one need only look at the newspaper. Well, ladies and gentlemen, let me tell you something. You can't do that. You can't do that because it is fundamentally unfair. One of the dangers is that you took an oath to decide this case on this case and not what may have happened somewhere else, to someone else. Mr. McNeely stands before you charged in this case, the evidence in this case. He is not responsible for all the ills of the world or anything that happens in the newspaper.

> The issue is, the only issue you must decide, is decide what happened in this case and you took and oath as jurors to decide matters based on this case and you took an oath also to resolve this matter without prejudice, without fear, without passion. Solely from the evidence in this case. I believe and I have confidence that you will [do] of that.

**28.** The trial court instructed the jury that it must decide the case

> without prejudice, without fear, without sympathy or favoritism .... You must decide this case solely from a fair consideration of the evidence [and you] must not allow the nature of the charges to affect

sumed to follow instructions, *see Clark v. United States,* 593 A.2d 186, 193 (D.C. 1991) (citations omitted), and we "will not 'upset the verdict by assuming that the jury declined to do so.' " *Harris v. United States,* 602 A.2d 154, 165 (D.C.1992) (en banc) (quoting *Gray v. United States,* 589 A.2d 912, 918 (D.C.1991)). There is little reason to doubt the ameliorative effect of these instructions given their forcefulness and timing. Moreover, after being fully briefed on the issue prior to sentencing, the trial court remained confident that the prosecutor's remarks had not prejudiced the defendant in light of the government's

overwhelming case; we see no reason to question this determination.

\* \* \* \* \* \*

Because we detect no reversible error in the trial proceedings, the judgments of conviction are

*Affirmed.*

your verdict in this case. You must consider only the evidence that's been presented

in this case in rendering a fair and impartial verdict.