**Rachel E. LOFTUS, Appellant,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

No. 10–CT–620.

District of Columbia Court of Appeals.

Argued Oct. 6, 2011.
Decided Sept. 13, 2012.

Chidi A. Ogolo, Washington, for appellant.

Christine Gephardt, Special Assistant Attorney General, for appellee. Irvin B. Nathan, Acting Attorney General for the District of Columbia at the time the brief was filed, Todd S. Kim, Solicitor General, Rosalyn Calbert Groce, Deputy Solicitor General, and Sidney R. Bixler, Assistant Attorney General, were on the brief for appellee.

Before FISHER and BLACKBURNE–RIGSBY, Associate Judges, and STEADMAN, Senior Judge.

---

Fisher, Associate Judge:

Appellant Rachel E. Loftus, who was convicted of operating a motor vehicle while her District of Columbia driver's license was suspended,[1] contends that the trial court improperly omitted the element of *mens rea* when instructing the jury. Appellant asserts that the government should have been required to prove "that she knew or had reason to know that her license was suspended before she was arrested." The District of Columbia responds that the operating after suspension (OAS) statute creates a strict liability offense, and that *mens rea* need not be proven. We conclude that we are bound by *Santos v. District of Columbia,* 940 A.2d 113 (D.C.2007), to uphold the District's position.[2]

## I. Background

On August 31, 2009, Anacostia Park Ranger Susan Bennett found Rachel Loftus sitting in a parked car with the motor running, beeping her car horn continuously. When Ranger Bennett asked appellant if she needed help, Ms. Loftus "aggressively exploded out of the car." Appellant staggered as she walked, exhibited quick mood swings, and was unable to answer simple questions. Concerned that Loftus might be under the influence of alcohol or drugs, Bennett called the United States Park Police. Meanwhile, appellant reen-

tered her vehicle and began slowly driving away. She was stopped by a responding Park Police officer, who then asked to see her license and registration. Appellant told the officer that she had "left the license at home," but provided a District of Columbia Identification Card. An identification check revealed that Ms. Loftus's driver's license had been suspended, and she was arrested.

At her jury trial, Ms. Loftus objected to the admission of her driver's record, which referred to prior DUI convictions. As an alternative to admitting the record, the parties stipulated that "Ms. Rachel Loftus's license was suspended in the District of Columbia on August 31, 2009." The government made no effort to prove whether the Department of Motor Vehicles (DMV) had notified Ms. Loftus that her license had been suspended. Ms. Loftus elected not to testify.

After the government had rested its case, appellant moved for a judgment of acquittal on the grounds that the government had failed to prove Ms. Loftus "knew or had reason to know" that her license had been suspended. Reasoning that *mens rea* is not an element of OAS, the court denied appellant's motion and delivered the standard "Red Book" jury instruction, which does not include a scienter requirement.[3] The jury convicted appel-

---

1. D.C.Code § 50–1403.01(e) (2009).

2. The jury also convicted Ms. Loftus of driving under the influence (DUI), D.C.Code § 50–2201.05(b)(1)(C) (2009), and operating a vehicle while impaired (OWI), D.C.Code § 50–2201.05(b)(2) (2009). Loftus does not challenge these convictions on appeal. In her brief, appellant indicates that upon completion of this appeal, she will move in the trial court to vacate the OWI conviction, leaving the DUI conviction intact. *See Santos,* 940 A.2d at 114. The District states that it will not oppose such a motion.

3. The Standard Jury Instruction states:

    The elements of operating after [revocation] [suspension] of permit, each of which the government must prove beyond a reasonable doubt, are that:

    1. [*Name of defendant*] operated a motor vehicle in the District of Columbia; and

    2. At the time [*name of defendant*] operated the vehicle, his/her privilege to operate a motor vehicle in the District of Columbia had been [revoked] [suspended] [because his/her driving privilege] was [revoked] [suspended] in his/her

lant of OAS, as well as DUI and OWI. Appellant subsequently moved to vacate her OAS conviction. Finding *Santos v. District of Columbia,* 940 A.2d 113 (D.C. 2007), to be controlling, the trial court denied the motion to vacate "because the OAS statute does not have a scienter requirement."

## II. Discussion

■ In *Santos v. District of Columbia,* decided just five years ago, this court held "that operating a motor vehicle without a permit in violation of D.C.Code § 50–1401.01(d) is a strict liability offense that does not require scienter. To convict Santos of that offense, therefore, the District did not have to prove that he knew his Virginia driver's license had been suspended." 940 A.2d at 118. Ms. Loftus was convicted of a different, but related, crime, operating a motor vehicle while her license was suspended (OAS), in violation of D.C.Code § 50–1403.01(e).[4] However, because the facts and reasoning of *Santos* are not meaningfully distinguishable from those of this case, we are bound by the holding in *Santos.*[5]

> home state of [*name of licensing state* ] . . . .

Criminal Jury Instructions for the District of Columbia, No. 6.403 (5th ed. rev.2009). The commentary to this instruction states: "It is not necessary that the government prove that the defendant received notice that his driving privilege was suspended or revoked. *See Santos v. D.C.,* 940 A.2d 113 (D.C.2007) . . . ."

4. The OAS statute states:

> Any individual found guilty of operating a motor vehicle in the District during the period for which the individual's license is revoked or suspended, or for which his right to operate is suspended or revoked, shall, for each such offense, be fined not to exceed $5,000 or imprisoned for not more than 1 year, or both.

D.C.Code § 50–1403.01(e) (2009).

## A. *Santos v. District of Columbia*

*Santos* involved a Virginia resident with a suspended Virginia driver's license who was pulled over for drunk driving in the District and subsequently convicted of operating a vehicle without a permit (OWP), in violation of D.C.Code § 50–1401.01(d) (2007 Supp.). 940 A.2d at 114. Had his Virginia license not been suspended, Santos would have qualified for the exemption that allows holders of valid out-of-state driver's licenses to operate a vehicle in the District of Columbia. *See* D.C.Code § 50–1401.02(a) (2007 Supp.). At trial, the government did not present evidence that, prior to his arrest, Santos received notification from the Virginia DMV that his driver's license had been suspended.[6] *Id.* Thus, like appellant, "Santos argue[d] that the District did not prove that he knew prior to his arrest that his driving privileges had been suspended, and hence failed to prove that he violated the statute with a criminal intent." *Id.* at 114. Santos asked this court to reverse his conviction for OWP on the grounds that the government had failed to prove *mens rea.* Instead, the court concluded that *mens rea*

5. Where the facts underlying a prior panel's decision "cannot be meaningfully distinguished from those present in this case," we are bound by that decision. *Penn Mut. Life Ins. Co. v. Abramson,* 530 A.2d 1202, 1212 (D.C.1987); *see M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971) ("no division of this court will overrule a prior decision of this court").

6. The government introduced Santos's Virginia driving record, which showed that he had been convicted of a traffic violation in Virginia, leading to his suspension. *Santos,* 940 A.2d at 115. However, his driving record indicated that Santos was "not present" when he was convicted of that offense, and that the mailed notice of suspension had gone "unclaimed." *Id.* at 116. Santos was eventually notified of his suspension in person by a Virginia DMV representative, but only after his arrest in the District of Columbia. *Id.*

was not an element of OWP and affirmed Santos's conviction. *Id.* at 118.

The facts of *Santos* are strikingly similar to those in this case. As in *Santos,* there is no disagreement that appellant at one point was issued a valid driver's license. Santos and appellant were both convicted after driving on suspended licenses, and in neither case did the trial court require the government to prove that the individuals knew that their licenses had been suspended. The only potential distinction is that Santos and appellant were convicted of violating different statutes.[7]

### B. The *McNeely* Factors

█ To determine whether a crime includes a *mens rea* element, we look to the intent of the legislature, as demonstrated by the plain language of the statute. *McNeely v. United States,* 874 A.2d 371, 387 (D.C.2005). Where, as here, a statute is silent on the question of *mens rea,* we consider four factors "helpful in determining whether the legislature intended to create a strict liability offense." *Santos,* 940 A.2d at 117; *see also McNeely,* 874 A.2d at 389 (citing *Staples v. United States,* 511 U.S. 600, 605–18, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994)). Those four factors are: "(1) the contextual rules of the common law; (2) whether the crime can be characterized as a 'public welfare offense' created by the legislature; (3) the extent to which a strict liability reading of the statute would seemingly encompass entirely innocent conduct; and (4) the harshness of the penalty." *Santos,* 940 A.2d at 117.

█ If we were writing on a clean slate, we might view the question of whether the legislature intended OAS to include a scienter requirement differently. *See State v. McCallum,* 321 Md. 451, 583 A.2d 250, 252 (1991) ("[W]e reach the conclusion that driving while suspended is not one of those 'public welfare' offenses where the Legislature intended to eliminate the requirement of *scienter.*"). However, because we can identify no significant differences between the OAS and OWP statutes based on the *McNeely* factors, we follow *Santos* and conclude that the legislature intended operating a motor vehicle after suspension to be a strict liability crime.[8]

On the first two factors, the analysis for both statutes is essentially identical. The crimes of OAS and OWP were both created in 1925 by the same legislation, the District of Columbia Traffic Act. Ch. 443, §§ 7(e), 13(d), 43 Stat. 1125 (1925). Like OWP, OAS "is not a crime derived from the common law, but rather is part of a modern regulatory framework that places the onus on motorists to obtain *and maintain* permits so as to protect the public from unqualified drivers." *Santos,* 940 A.2d at 117 (emphasis added). And because operating a "motor vehicle on a public

---

7. Although addressing a similar question, *Foster v. District of Columbia,* 497 A.2d 100 (D.C.1985), did not decide this issue. In *Foster,* the appellant challenged his OAS conviction on the ground that the DMV had not sent him proper notice in accordance with its regulations. *Id.* at 100. The trial court had instructed the jury to find him guilty of OAS, the government had to prove that "the defendant had notice that he was suspended." *Id.* at 102. This court ultimately concluded that it "need not decide whether notice of a suspension is a necessary element of the offense," as there was ample evidence to show that the appellant knew that his license had been suspended. *Id.*

8. Courts have taken a wide variety of approaches to this question. Some jurisdictions appear to treat operating after suspension as a strict liability crime, while others require proof that notice of the suspension was sent by the DMV; still others require proof that notice was received by the appellant. *See State v. Swain,* 245 Conn. 442, 718 A.2d 1, 6 n. 15 (1998) (collecting cases).

street is a potential danger," OAS may be characterized as one of the " 'public welfare offenses' created by the legislature to regulate potentially dangerous activities." *Id.* (internal editing omitted) (quoting *Richardson v. District of Columbia,* 134 A.2d 492, 493 (D.C.1957) (interpreting the OWP statute)).

A potential difference is "the extent to which a strict liability reading of the statute would seemingly encompass entirely innocent conduct." *Id.* at 117. While the requirement to obtain a driver's permit is "ubiquitous and familiar to all motorists," *id.,* the circumstances under which a permit may be suspended are less familiar, and potentially more prone to administrative error. However, the District of Columbia has a well-defined system for providing notice and a hearing before licenses are suspended. *See* D.C.Code § 50–1403.01(a) (2009); 18 DCMR §§ 300.2, 307.1–.7 (2009). In *Santos* we noted that

a driver's license cannot be suspended or revoked without due process, including both fair notice of a traffic violation charge and the potential penalties, and the right to a hearing. Admittedly, no system of procedural protection is perfect. Nonetheless, we think it extremely unlikely that any motorist *justifiably* will be unaware of the lawful forfeiture of his or her driving privileges.

940 A.2d at 117 (emphasis in original) (citing *Bell v. Burson,* 402 U.S. 535, 539, 542, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971)). *Santos*'s reasoning therefore applies to this prong of *McNeely* as well.

Thus the only potentially distinguishing feature between *Santos* and this case is the admitted difference in the two statutes' respective penalties. *See Staples,* 511 U.S. at 618, 114 S.Ct. 1793 ("[A] severe penalty is a further factor tending to suggest that Congress did not intend to eliminate a *mens rea* requirement."). At present, OWP may result in a fine of not more than $300 and a prison term of not more than ninety days. D.C.Code § 50–1401.01. OAS, on the other hand, may result in a fine of not more than $5,000 and a prison term of not more than one year.[9] D.C.Code § 50–1403.01(e). Even so, both crimes are misdemeanors. *See Santos,* 940 A.2d at 118 ("the lightness of the potential penalties supports the inference that strict liability was intended"). Courts have interpreted statutes as imposing strict liability where the potential penalties were far more severe than those currently imposed for OAS. For instance, in *McNeely,* we noted that "the relative severity of the punishment, a fine of up to $20,000 and imprisonment of up to two years, favors the imposition of a *mens rea* requirement," but we held that owning a pit bull was a strict liability crime. 874 A.2d at 390; *see also United States v. Burwell,* 690 F.3d 500 (D.C.Cir.2012) (en banc) (holding that 18 U.S.C. § 924(c)(1)(B)(ii), which imposes a mandatory thirty-year sentence for any person who carries a machine-gun while committing a crime of violence, does not require proof that the defendant knew the weapon he was carrying could fire automatically). In short, none of the four *McNeely* factors distinguishes this case from *Santos* or leads us to the conclusion that the legislature intended the OAS statute to include a *mens rea* element while the OWP statute does not.[10]

---

9. When the legislature first created both crimes in 1925, OAS and OWP bore the same maximum penalty (a fine of not more than $500 and/or imprisonment of not more than one year), although OAS also included a mandatory minimum sentence for a $100 fine and thirty days' imprisonment. District of Columbia Traffic Act, ch. 443, §§ 7(e), 13(d), 43 Stat. 1125 (1925).

10. We here deal only with the issue whether, as an across-the-board matter, the govern-

### III. Conclusion

Finding no meaningful difference between this case and *Santos*, we affirm Ms. Loftus's conviction for operating after suspension. Pursuant to *Santos*, we remand the case solely to permit the trial court to vacate one of the convictions for DUI and OWI. 940 A.2d at 118.

*It is so ordered.*

ment must in all cases prove notice or knowledge as an element of the offense of OAS. We do not address a situation where the defendant presents some evidence that he or she had no notice of suspension and had no idea that the permit had been suspended. In such a scenario, not present here, the government, similar to instances where self-defense is raised, may well have the obligation to at least present proof that the constitutionally requisite notice of suspension was properly sent.