2021 IL App (1st) 192396-U

No. 1-19-2396

Order filed May 14, 2021

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| VILLAGE OF RIVERDALE, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 19 M6 2115 |
| MICHELE WILLIAMS, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Michael B. Barrett, |
| | ) | Judge, Presiding. |

JUSTICE ODEN JOHNSON delivered the judgment of the court.
Justices Sheldon Harris and Maureen Connors concurred in the judgment.

**ORDER**

¶ 1     *Held*:   We affirmed the hearing officer's determination that Riverdale's animal nuisance ordinance was malum prohibitum and thus required no mental state and found that the hearing officer's factual findings that defendant violated the ordinance were not against the manifest weight of the evidence.

¶ 2     Defendant Michelle Williams appeals from an order of the circuit court of Cook County that partially affirmed a hearing officer's determination that defendant violated the Village of Riverdale's (Riverdale) animal nuisance ordinance. On appeal, defendant contends that the

hearing officer's determination of liability was erroneous because the word "permit" contained in the ordinance imposes a knowledge requirement that was not proven by Riverdale. Defendant additionally contends that the manifest weight of the evidence supports reversal of the determination that she violated section 6.08.020 of the Riverdale Municipal Code (Municipal Code). Although Riverdale has not filed a brief on appeal, we will consider the appeal pursuant to the principles set forth in *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 131-33 (1976). For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4                          A. Administrative Hearing Proceedings

¶ 5     The record reveals that on the afternoon of June 24, 2018, Officer Jordan responded to a call regarding two brown "vicious" pit bulls that were actively killing a smaller dog. The Riverdale Police Department received a total of eight calls regarding the pit bulls. According to the police report, a citizen was in immediate danger of receiving great bodily harm, so Officer Jordan exited his vehicle and shot one of the pit bulls three times. As assisting Sergeant Kozeluh and assisting Officer Ellis arrived on the scene, the other pit bull attempted to charge Sergeant Kozeluh. Officer Jordan then shot that dog three times as well. Defendant was identified as the owner of the pit bulls.

¶ 6     Officer Jordan issued citation number MO-136-452 to defendant, alleging violations of the following sections of the Municipal Code, Chapter 6.08: section 020, animal nuisance; section 060, biter animal; and section 240, failure to restrain a vicious or dangerous animal.

¶ 7     Section 6.08.020 of the Municipal Code, Animal nuisances, provides as follows:

"An owner is in violation of this chapter when he permits his animal to:

   A.  Run uncontrolled.

   B.  Molest persons or vehicles by chasing, barking, or biting.

   C.  Attack other animals.

   D.  Damage property other than the owner's.

   E.  Bark, whine, howl or make other noises excessively.

   F.  Create noxious or offensive odors." Ord. 96-21, 1996.

Section 6.08.060, Biter animals, provides as follows:

"A. Official procedure for bite cases shall be as follows:

1. When the animal control officer receives information that a person has been bitten by an animal, the animal owner shall be instructed to have the animal examined by his veterinarian within twenty-four hours.

2. If the animal bite occurred off the animal owner's property or when the animal was left without proper control, a citation shall be written against the animal owner.

3. When the animal control officer has filled out the Cook County animal bite report in full, he shall send his report within twenty-fours to the local public health department or to the Cook County department of animal control.

4. All animals that bite must be impounded for ten days, following the first examination.

5. Impoundment at home or at a facility under the observation of a licensed veterinarian shall be dependent upon a current rabies vaccination and the ability of the animal owner to confine the biting animal.

6. When an owner of a biting animal has no personal veterinarian, or refuses to obtain the services of a veterinarian, the animal control officer shall have the animal impounded for ten days.

7. All animals impounded shall have a record. The record shall include the animal owner's name, address and telephone number, if available; species or breed, color, sex and license or tag number if available; and the time and date impounded.

8. The veterinarian examining the biting animal shall fill out and then send within twenty-four hours the Cook County rabies observation notice to the Cook County department of animal control.

9. Following the examination of the biting animal at the end of the ten-day confinement period the veterinarian shall complete the Cook County rabies release report and he shall send this report within twenty-four hours to the Cook County department of animal control.

B. The animal owner is responsible for all costs relating to the examination and impoundment of the biting animal.

C. Any person having knowledge of a biting animal that has not been properly examined and who does not report this fact to the animal control officer is in violation of this chapter.

D. It is unlawful for the owner of a biting animal to euthanize, sell, give away, or otherwise dispose of such animal until it is released by the Cook County animal control administrator or his authorized representative." Ord. 96-21, 1996.

Section 6.08.240, Restraint of vicious or dangerous animals, provides as follows:

"Every animal declared dangerous or vicious shall be confined by its owner or authorized agent of its owner within a building or secure enclosure and, whenever off the premises of its owner, shall be securely muzzled and restrained with a chain having minimum tensile strength of three hundred pounds and not more than three feet in length, or caged. Every person harboring a vicious animal is charged with an affirmative duty to confine the animal in such a way that children do not have access to such animal." Ord. 2001-23, 2001.

¶ 8 After several continuances and discovery matters were completed, the hearing was scheduled to begin in October 2018. Hearings on the citations were held on October 10, 2018, December 12, 2018, and January 9, 2019.

¶ 9 Defendant testified at the hearing that she lived at 13904 Clark and owned two pit bulls, Sandy and LuLu, for approximately six years. She described Sandy as an eight-year old, tan, docile rescue dog that was crippled due to a broken hip. Defendant described LuLu as a smaller pit bull, that was a "little more hyper" but overall happy and obedient "for the most part." To her knowledge, neither dog had ever bitten anyone or acted aggressively towards anyone. She stated that Sandy and LuLu played with the next door neighbor's dog, a yorkie. On June 24, 2018, she was at the grocery store when her son, Christopher, called and informed her that Sandy and LuLu were shot and killed. He was not home at the time and had been notified by a neighbor, Loree Washington. While acknowledging that she did not personally observe anything, she testified that she later learned that Sandy and LuLu pried a window screen away and exited her home while the small dog was on her property unleashed. Her dogs sniffed the smaller dog, then ran back and forth between the front and back yards before "casually" walking to her neighbor's yard next door.

Defendant identified an enlarged photo of her screen that was pried away by her dogs but would not confirm that paw prints were shown in the photo. She further stated that she did not knowingly permit the dogs to be outside of the house and had never knowingly allowed them to walk unleashed outside of her presence. Defendant indicated that the dogs were shot in her next door neighbor's yard, where they were allowed to be. On redirect, defendant confirmed that the dogs were home alone that day.

¶ 10    Officer Ellis testified that on June 24, 2018, he observed one dead dog that had been shot, and another dog which was subsequently shot after it attempted to get up from an injury sustained from a steel pipe and lunged at the Sergeant. He stated that he arrived after the first dog had already been shot, and he recalled the incidents occurring either in front of 13904 or 13906 Clark. Officer Ellis stated that the small dog appeared to be dead.

¶ 11    Wanda Beamon testified that on June 24, 2018, she was on the side of her house fixing a screen. She lived across the street from defendant, and her children were out in the front playing with her dog, Sky. She heard a commotion with the dogs, and she then went to the front of her house where she saw LuLu and Sandy mauling and pulling Sky, who was screaming. She told her son to go and get his dad. At the time, all three dogs were down towards defendant's property, and Sky was bleeding from her mouth. She ran across the street to a lady who called the police, and other neighbors indicated that they had also called police. Beamon spoke to the police on a neighbor's phone and told them that the two pit bulls attacked her dog. Beamon then went back across the street to her house, and her fiancé James McSwain was coming down the street with a pole. One of the pit bulls charged at him and he hit it with the pole and then the second pit bull charged at him. McSwain slipped and fell in the grass and that's when Officer Jordan shot the dog.

At that time, Beamon ran to get her dog and took it home. She took Sky to the vet and she had four bites but recovered. Beamon testified that she knew defendant and knew the dogs. Before LuLu came, Beamon stated that Sandy was a docile dog, but afterwards, she changed. Beamon had previously observed people running from the pit bulls when they had gotten out; some jumped on top of a car to escape them.

¶ 12    On cross-examination, Beamon stated that the dogs were in front of Washington's house, on the parkway, and that prior to that day, there had never been an altercation or any interaction between Sky, Sandy and LuLu. In response to the hearing officer's question of whether she had anything else to say, Beamon stated that before this incident, she and defendant never had any problems. She attempted to talk to her that day, but defendant walked away and called her "all kinds of names."

¶ 13    Washington testified that she resided at 13908 Clark, had been defendant's neighbor for years, and was familiar with Sandy and LuLu, who were allowed on her property. Prior to June 24, 2018, to her knowledge, they had never bitten anyone or acted aggressively towards anyone or other animals. On that date, she was inside the house and heard what she thought were fireworks outside. When she opened the door, she saw a police officer shoot LuLu twice and she screamed. She heard another neighbor, McSwain, saying "they attacked me." She saw that he was right by her vehicle with a steel pipe in his hand. Washington screamed, "what is going on," and saw Beamon holding her dog in her arms, saying "they killed my dog." When she saw the shooting, LuLu was down, and was not lunging at anyone. Washington took pictures of the dead dogs for defendant because she was unable to reach her. The photos showed Sandy in her front yard and LuLu on the parkway in front of her house.

¶ 14    On cross-examination, Washington admitted that she did not observe any of the initial altercation between the three dogs because the first time she saw anything that day was after she heard gunshots.

¶ 15    Officer Jordan testified that on June 24, 2018, at approximately 3:08 p.m. he was dispatched to answer a call at 13905 Clark. When he arrived, he saw women and children standing behind a vehicle shielding themselves and pointing across the street. There were several children crying and a woman was screaming. As he exited his vehicle, Officer Jordan saw a pit bull standing erect with the tail pointed erect and growling, and a second pit bull lying down, growling and biting into an object. He later learned that the object was someone's dog. The two pit bulls were in the front yard of 13902 Clark. Officer Jordan observed McSwain walking down the sidewalk carrying a metal object and heard him shout, "that's my dog." The second pit bull noticed McSwain and immediately "charged" him. Officer Jordan testified that he saw the pit bull barking, growling, and running with the tail erect. When the tail is erect, Officer Jordan testified that meant that the animal was preparing to attack again or was aggravated and upset. McSwain swung the metal object just before the pit bull jumped at him, and struck it in the neck and head region, knocking the dog unconscious. Then McSwain fell to the ground. The pit bull that was mauling the other dog then charged McSwain in the same manner. When Officer Jordan saw the second pit bull charging McSwain, he drew his gun and shot the dog to prevent McSwain from "receiving great bodily harm." Officer Jordan also stated that none of the dogs were leashed when he observed them. Officer Jordan shot the dog three times and McSwain was able to get up. McSwain and his family then recovered the mauled dog. At that time, additional officers arrived. While they were assessing the mauled dog, the pit bull that had been struck by the metal object regained

consciousness and began growling. The dog got up and attempted to charge the watch commander, Sergeant Kozeluh, who was three feet away. Officer Jordan pulled his gun out again and shot the second pit bull. He then spoke with McSwain and Beamon, and he observed Beamon with a lot of blood on her shirt and hands. The small dog was motionless and covered with blood.

¶ 16    On cross-examination, Officer Jordan described "mauled" as the pit bull growling and biting the smaller dog while also digging into it with its paws. He stated that he was approximately 15 yards away when he observed the mauling, and he thought the dog was going to charge him. He observed the dogs on the parkway. Officer Jordan also testified that a dog can be off leash in an area it was allowed to be in.  On redirect, Officer Jordan testified that he did not know how Beamon's dog got to the front lawn of 13902 Clark.

¶ 17    Sergeant Kozeluh testified that on June 24, 2018, between 3:08 p.m. and 3:10 p.m. he was answered a call involving a vicious animal in the 13900 block of Clark.[1] When he arrived, he saw what he believed to be two deceased pit bulls and Officer Jordan.  One of the dogs was closer to the house and the other one was towards the sidewalk. He also saw a bloody, small black and white dog. Sergeant Kozeluh initially thought Officer Jordan had shot both dogs, and while he was walking around to try and get information on what happened, Officer Jordan fired his weapon again into one of the pit bulls that had gotten up behind him. Sergeant Kozeluh never saw the dog get up and was surprised when it got up because he thought it was already dead. He testified that he unsuccessfully tried to reach the owner of the pit bulls, and then called the fire department to remove the animals because they had to take them off of the street. Sergeant Kozeluh eventually

---

[1] Sergeant Kozeluh testified that the block was "3900 Clark" but we take judicial notice from other parts of the record that it was in fact 13900 Clark.

spoke with Beamon at her house, took photos of her dog, and urged her to get medical treatment for her dog. On cross-examination, Sergeant Kozeluh testified that it was department procedure not to return dogs that were killed by the police.

¶ 18   Defendant's son, Christopher, testified that he was unaware of Sandy and LuLu ever biting anyone or being aggressive with other dogs that they played with. He was not home during the altercation, but Washington called him and sent him photos of Sandy and LuLu after they were shot by the police. He arrived home approximately 30 minutes later, then went to the police station before returning home again. When he returned home the second time, he and defendant went to Beamon's house to look at her dog and saw no injuries to the dog.

¶ 19   Sharon Thompson testified that she lived at 13902 Clark and knew defendant and her dogs. To her knowledge, Sandy and LuLu had never bitten anyone, or acted aggressively toward anyone or any other animal. She was inside of her house on June 24, 2018, when she heard women screaming. Thompson went outside and saw the women standing across the street and observed defendant's two dogs rough playing with another dog in front of defendant's house. Thompson went back into her house for a while before coming back outside and saw the police shoot one of defendant's dogs in the head.  She then saw the officer stand over the dog and shoot it again. She further testified that when she first came outside, she saw Sandy "roughhousing" Beamon's dog, who was just sniffing the grass. Thompson testified that these events occurred in front of defendant's house, and that she did not see McSwain or Beamon.  She clarified that there were a lot of people out there, so she would not know if they were out there or not.  Thompson also stated that she never saw either of defendant's dogs acting aggressively before they were shot, and she only witnessed two shots fired by the officer.

¶ 20    On cross-examination, Thompson stated that one officer arrived when she was outside the first time, and then when she returned the second time, there were two or three police vehicles out there.  She also stated that there are bushes between the houses, so she could not see her neighbor's yard if she stood on her porch.

¶ 21    The record indicates that on January 9, 2019, the hearing officer entered a finding of code not violated for the citation issued to defendant on section 6.08.240, failure to restrain a vicious or dangerous animal. On the same date, there was a finding of violation of section 6.08.060, biter animal. Subsequent to those findings, the parties were permitted to submit written closing arguments by January 30, 2019.

¶ 22    In a written order dated February 7, 2019, Hearing Officer Luke Hajzl made the following factual findings based on the evidence presented at the hearing.  Defendant was the owner of two pit bulls, LuLu and Sandy (the dogs). On June 24, 2018, the dogs exited defendant's home by pushing through the window screen of an open window, which faced the unfenced front yard of defendant's home. The dogs were off leash and entered a neighbor's (Kathleen Washington's) property without supervision from any person responsible for their care and well-being.  LuLu bit Wanda Beamon's shih tzu dog, Scottie[2], causing damage to Scottie and a threat to public safety. The hearing officer "empathized with defendant on the loss of her dogs as akin to the loss of any close family member." The hearing officer considered defendant's alleged violations of the three sections of the Municipal Code separately as detailed below.

¶ 23                                    1. Section 6.08.020

_____

[2] The hearing officer's final order referred to Beamon's dog as "Scottie," but testimony at the hearing established that her name was "Sky."

¶ 24    Defendant made three arguments in opposition to violation of section 6.08.020 of the Municipal Code: (1) the word "permit" in the ordinance required actual knowledge; (2) section 6.08.020(A) was not supported because the dogs were on the property of a homeowner that did not object to their presence; and (3) the village did not prove an attack on other animals.

¶ 25    The hearing officer determined that the facts supported three violations: sections 6.08.020(A), 6.08.020(C) and 6.08.020(D).   The hearing officer found defendant's section 6.08.020(A) argument unpersuasive, noting that the best evidence of legislative intent was the language of the statute itself, which must be given its plain and ordinary meaning. The hearing officer found that "run" meant "to go without restraint" and that "uncontrolled" meant "done without being stopped, slowed, or controlled" as defined in Merriam-Webster Dictionary. The hearing officer concluded that on June 24, 2018, the dogs were unsupervised and unrestrained and as a result, they made their way to Washington's property where the events described in the police report occurred. The hearing officer further found that whether or not Washington objected to their presence was immaterial.

¶ 26    With respect to defendant's section 6.08.020(C) argument, the hearing officer found that it was unpersuasive because her exhibits 10-12 in conjunction with witness testimony demonstrated by a preponderance of the evidence that LuLu bit Sky. The hearing officer further found that whether it was rough play or provoked by Sky was immaterial because it was nevertheless an animal attack. The hearing officer determined that despite defendant's assertion, section 6.08.020(D) was applicable because in the eyes of the law, a dog is an item of personal property.

¶ 27    Turning to defendant's argument that section 6.08.020 required actual knowledge, the hearing officer relied on *Village of Northbrook v. Cannon*¸ 61 Ill. App. 3d 315 (1978) for the

proposition that lack of knowledge or intent was not a defense to a violation of a prohibition punishable by fine which provided for liability for allowing or permitting a given result. The hearing officer determined that the case was controlling authority on the matter and found that defendant's reliance on *Covenant Club of Chicago v. Thompson*, 259 Ill. App. 122 (1927) was misplaced because it relied on the antiquated notion of "sufferance and permission." According to the hearing officer, the "narrowly tailored term of art" was addressed in *City of Champaign v. Auler*, 110 Ill. App. 3d 243 (1982), where the court "found itself bound by *stare decisis* on the phrase 'suffer or permit.'" However, the hearing officer found that the current case was distinguishable as the language in the Code did not contain the phrase "suffer or permit," and moreover, even if *Auler* were applied, defendant would still be liable because she had a duty to secure the dogs when off her property. The hearing officer determined that defendant breached that duty by leaving an open window by which the dogs could escape, and that action was the proximate cause of the damage to public safety/Sky.

¶ 28                                    2. Section 6.08.060

¶ 29    Defendant made one argument regarding the alleged violation of section 6.08.060 of the Municipal Code; that it only applied to people. The hearing officer found that the section simply stated, 'bite cases," and that there was no restriction in section 6.08.202(A)(2) and would not read into that section the condition that the bite must be to a person where the plain language of the ordinance did not set forth such limitation.

¶ 30                                    3. Section 6.08.240

¶ 31    Defendant made several arguments regarding the alleged violation of section 6.08.240, including that "the ordinance, as written, required a prior declaration [and] no prior declaration

was made in this case." The hearing officer found that argument persuasive because there was no evidence presented to support the notion that any governmental entity declared the dogs vicious. The hearing officer determined that while section 2.05 of the Animal Control Act (510 ILCS 5/2.05(a)(i) (West 2018)) could be used to declare that the dogs were dangerous after escaping, there was no evidence presented at the hearing that defendant's dogs were previously declared dangerous. The hearing officer found no violation of section 6.08.240.

¶ 32                              4. Decision and Fines

¶ 33    The hearing officer determined that defendant violated sections 6.08.020 and 6.08.060 of the Municipal Code but did not violate section 6.08.240. Defendant was assessed $50 in hearing costs, $500 for violation of section 6.08.020 and $250 for violation of 6.08.060, for a total of $800. Defendant subsequently appealed the hearing officer's determinations in the circuit court of Cook County and filed her complaint for administrative review on February 19, 2019.

¶ 34                           B. Circuit Court Proceedings

¶ 35    Defendant's complaint for administrative review sought dismissal of the hearing officer's findings that she violated sections 6.08.020 and 6.08.060 of the Municipal Code. Defendant subsequently filed a specification of errors on July 24, 2019, contending that: (1) Riverdale failed to prove a violation of section 6.08.20 because she did not "permit" her dogs to run free, attack or damage property as required by the ordinance, and (2) Riverdale failed to prove a violation of section 6.08.060, biter animal, because that section only addressed bites to people.

¶ 36    Riverdale filed its response on August 29, 2019, contending that proof of knowledge was not necessary to find that defendant violated section 6.08.020(A) and further that the record contained evidence to support that the dogs ran uncontrolled, attacked other animals, and damaged

property other than the owner's. Riverdale further asserted that section 6.08.060 did not apply only to people who were bit by an animal.

¶ 37    The circuit court heard argument by both parties on October 8, 2019 and took the matter under advisement.  Ruling was scheduled for November 14, 2019.

¶ 38    The parties filed an agreed statement of facts from the November 14, 2019, hearing because no report of proceedings was filed. Per the agreed statement of facts, the circuit court reviewed *de novo* the violation of section 6.08.060 and referenced the Municipal Code's language in section 6.08.230, biting dogs or cats, in limiting the definition of biter animal to mean a dog that has bitten a person. The circuit court therefore overturned defendant's violation of section 6.08.060. With regard to the violation of section 6.08.020, the circuit court reviewed it using the manifest weight of the evidence standard and upheld the violation. Defendant sought clarification on the section 6.08.020 ruling by inquiring whether the circuit court read the term "permit" to mean knowledge. The court replied that it did not need to construe the statute to determine whether it required knowledge because there was evidence in the record to support a finding of a violation, and the decision was not against the manifest weight of the evidence. The court further stated that defendant's dogs were off of her property and ran uncontrolled, thus defendant was in violation of the ordinance.  Defendant's timely notice of appeal was filed on November 20, 2019.

¶ 39                                              ANALYSIS

¶ 40    On appeal, defendant contends that the hearing officer's determination of liability was erroneous because the word "permit" contained in the ordinance imposes a knowledge requirement that was not proven by Riverdale. She argues that the hearing officer mistakenly relied on *Northbrook v. Cannon*, 61 Ill. App. 3d 315 (1978) in determining that the ordinance was malum

prohibitum and that no proof of intention or awareness of an alleged violation was required. Instead, defendant asserts that the controlling case law on this matter is found in *Covenant Club of Chicago v. Thompson*, 259 Ill. App. 311 (1930), and *City of Champaign v. Auler*, 110 Ill. App. 3d 243 (1982). Those cases each found the ordinances in question to impose a knowledge requirement before a violation could be asserted. Defendant argues that, because she was not home when the dogs got out and could not anticipate their escape, she did not have the requisite knowledge required for liability under the ordinance. Additionally, defendant contends that the manifest weight of the evidence supports reversal of her violation of section 6.08.020 of the Municipal Code.

¶ 41                                  A. Standard of Review

¶ 42    In administrative review cases, this court reviews the decision of the administrative agency, not the decision of the circuit court. *Lipscomb v. Housing Authority of County of Cook*, 2015 IL App (1st) 142793, ¶ 11. When a court reviews the decision of an administrative agency, the court must review only the record of the administrative proceedings. *Id.*

¶ 43    To determine the applicable standard of review of an administrative decision, this court must consider whether the question presented is one of fact, one of law, or a mixed question of law and fact. *Board of Education of Valley View Community Unit School District 365-U v. Illinois State Board of Education*, 2013 IL App (3d) 120373, ¶ 37. Rulings on questions of fact will be reversed only if against the manifest weight of the evidence; questions of law are reviewed *de novo*; and a mixed question of law and fact is reviewed under the clearly erroneous standard. *Id.*

¶ 44                         B. Construction of the Word "Permit" in the Ordinance

¶ 45    In the case at bar, defendant contends that the word "permit" contained in section 6.08.020 of the Municipal Code requires a finding of knowledge before a violation can be imposed on a party. The issue in this case is whether section 6.08.020 creates an absolute liability offense, or an offense malum prohibitum. We note that the hearing officer found the ordinance to be a strict liability statute, which is a legal conclusion. As such, we review that legal finding *de novo*. *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 503 (2000).

¶ 46    We construe statutes and municipal ordinances under the same principles. *Sullivan v. Village of Glenview*, 2020 IL App (1st) 200142, ¶ 23. We must ascertain and give effect to the intent of the legislative body. *Id.* at ¶ 24.  We start with the plain language of the ordinance, given its ordinary meaning. *Id.*  If the statute or ordinance is unambiguous, the judicial inquiry ends; we apply the language as written. *Id.*  If, however, we find ambiguity in the language, we may resort to extrinsic aids to determine legislative intent. *Id.*

¶ 47    One of the fundamental principles of statutory construction is to view all provisions of an enactment as a whole. *Brucker v. Mercola*, 227 Ill 2d 502, 514 (2007).  Accordingly, words and phrases must be interpreted in light of other relevant provisions of the statute and not construed in isolation. *Id.* Additionally, we interpret statutes as a whole, rejecting an interpretation that exalts one provision of a statutory scheme over another. *Van Milligan v. Department of Employment Security*, 373 Ill. App. 3d 523, 538-39 (2007).

¶ 48    As stated previously, section 6.08.020 of the Municipal Code governs animal nuisances and provides as follows:

        "An owner is in violation of this chapter when he permits his animal to:

        G.  Run uncontrolled.

H.  Molest persons or vehicles by chasing, barking, or biting.

I.  Attack other animals.

J.  Damage property other than the owner's.

K.  Bark, whine, howl or make other noises excessively.

L.  Create noxious or offensive odors."  Ord. 96-21, 1996.

¶ 49    Other relevant sections of the Municipal Code are set forth below.

¶ 50    Section 1.04.060, prohibited acts include causing and permitting, provides that: "whenever in the ordinances of the village of Riverdale, any act or omission is made unlawful, it shall include causing, allowing, permitting, aiding, abetting, suffering or concealing the fact of such act or omission."

¶ 51    Section 1.01.090, penalty, provides that a violation of any of the provisions of the Municipal Code shall be a misdemeanor, and unless a lower penalty is specified, any violation shall be punishable by a fine of not more than $500 or by imprisonment for a period of not more than six months, or both. Ord. dated 1-12-82.

¶ 52    A municipality has the power to declare anything a nuisance, which is either nuisance *per se*, a nuisance at common law or statute. *McCarthy v. Kunicki*, 355 Ill. App. 3d 957, 964 (2005). To protect the public, the government may, in the exercise of its police powers, make the performance of a specific act a crime regardless of either knowledge or intent.  *People v. Ruberg*, 76 Ill. App. 3d 671, 672 (1979).  It is well-settled that scienter is not required where an offense is malum prohibitum, i.e., a wrong because it is proscribed to be so. *People v. Johnson*, 288 Ill. 442, 445 (1919). As the United States Supreme Court has noted, "neither this Court nor, so far as we are aware, any other has undertaken to delineate a precise line or set forth comprehensive criteria

for distinguishing between crimes that require a mental state and crimes that do not." *Morrissette v. United States*, 342 U.S. 246, 260 (1952).

¶ 53    We have reviewed the case that the hearing officer found to be directly on point, namely *Village of Northbrook v. Cannon*, 61 Ill. App. 3d 315 (1978).   In *Cannon*, the defendant was convicted of permitting his dogs to run uncontrolled thereby creating a nuisance in violation of the village's animal control ordinance.  *Id.* at 316-17.   After a bench trial, the defendant was found guilty and assessed $40 in fines and $20 in costs.  *Id.* at 317.   On appeal, the defendant contended that the trial court erred in its interpretation of the ordinance as it applied to the facts presented. *Id.*

¶ 54    In that case, Officer Manes testified that on March 19, 1977, he picked up two dogs after he observed them running along the Strand near Newport in Northbrook.  *Id.*   The dogs were picked up and impounded and later picked up by defendant's daughter.  *Id.*   On April 16, 1977, Officer Manes testified that he picked up the same two dogs in back of premises near Willow and the Strand, and informed defendant's minor son that the dogs would be taken to the police station because he wanted to deliver them to an adult.  *Id.*   Defendant later picked up the dogs at the police station.  *Id.*   Officer Manes testified that he did not know of any evidence that defendant caused, permitted, or even was aware of the dogs being out on either occasion except the fact that the dogs were out.  *Id.*

¶ 55    The defendant testified that he was away from home and outside of Northbrook both times the dogs were picked up and that the dogs were safely inside his home at the time he left on each date. *Id.* The defendant was charged with two violations on each date. *Id.* At trial, the defendant testified that at two earlier trials he had been found not guilty of charges related to comparable

sections of an earlier animal law, where the words "cause" or "permit" had been interpreted to require his knowledge that the dogs were running uncontrolled. *Id.*

¶ 56    At the conclusion of the trial, the trial court found the ordinance was malum prohibitum and no proof of intention or awareness of an alleged violation was required, and defendant was found guilty and assessed a fine and costs. *Id.* at 317-18.   Section 16.10 of the animal control ordinance at issue in *Cannon* provided, in pertinent part: "it shall be unlawful for the owner or harborer of any dog, cat or other domestic animal to cause or permit such animal to perform, create or engage in any nuisance as defined by Paragraph 16.1(c)." The ordinance described an animal nuisance as when an animal owner permitted his animal to run uncontrolled in section 16.1(c).  *Id.* at 319.

¶ 57    The defendant argued on appeal that the Village never proved that he "permitted" the dogs to create a nuisance, just like defendant argues in the instant case.  *Id.* at 320. The Village argued that the ordinance was malum prohibitum and no proof of intent was required, analogizing the situation to cases decided under provisions of the Illinois Environmental Protection Act (Ill.Rev.Stat.1977, ch. 111 1/2, par. 100 *et seq.*). *Id.*  at 320.  This court found the parallel between the animal control ordinance and the Environmental Protection Act to be clear, noting that "both measures [were] directed at making the day-to-day surroundings of citizens safe and salutary by deterring acts which result in the introduction into those surroundings of unsafe, unsanitary or unpleasant factors." *Id.* We further determined that "unrestrained activity of animals whose existence [was] supported by humans threaten[ed] the safety and pleasantness of streets, parks, sidewalks and yards.  *Id.* We found that the ordinance punished passive activity by persons who obtained some benefit from the continued existence of the particularly harmful agent, and the result

was that the persons who benefitted paid for the benefit by being responsible for prevention and release of their charges. *Id.* at 321. We concluded that the punishment was not linked to a *mens rea*, and that lack of knowledge or intent was not a defense. *Id.*

¶ 58    We find *Cannon* to be directly on point, as noted by the hearing officer, and we see no reason to depart from it. Section 6.08.020 serves to hold owners responsible for certain animal behaviors that Riverdale has deemed a nuisance or harmful to the public, which is a legitimate government exercise of its police powers for a legitimate purpose. The health, safety, welfare, and comfort of the population of cities and villages are proper subjects for the exercise of a village's police powers. *City of Chicago v. Wonder Heating & Ventilating Systems*, 345 Ill. 496, 500 (1931). Additionally, the ordinance bears a rational relationship to that legitimate governmental purpose by imposing a deterrent, namely a fine, for owners whose animals engage in the actions considered to be a nuisance by the ordinance.

¶ 59    We are unpersuaded by defendant's reliance on *Covenant Club of Chicago v. Thompson*, 259 Ill. App. 311 (1930) and *City of Champaign v. Auler*, 110 Ill. App. 3d 243 (1982). *Covenant Club* is distinguishable from the case at bar as it did not involve a municipal ordinance but rather a demurrer to defendant's declaration which alleged that defendant caused or permitted a nuisance in that sewage from his land ran onto adjoining land. *Covenant Club*, 259 Ill. App. at 312-13. This court found that the definition of "permit" included "knowledge" for purposes of determining whether defendant properly stated a cause of action. *Id.* at 319.

¶ 60    In *City of Champaign*, the defendant was convicted of violating a municipal ordinance similar to that at issue in the present case which prohibited dogs from running at large and he appealed, contending that the ordinance was not a malum prohibitum offense. *City of Champaign*,

110 Ill. App. 3d at 244. The ordinances at issue contained the terms "suffer or permit" and "permit." *Id.* The Fourth District of this court declined to follow *Cannon* because it "[did] not cite or distinguish the authorities cited by defendant in the case at bar." *Id.* at 246. Further, the Fourth District found that the phrase "suffer or permit" had been construed by our supreme court as requiring proof of knowledge or negligent conduct on the part of the animal's owner, in a series of civil war era cases. *Id.* While *stare decisis* requires courts to follow the decision of higher courts, it does not bind courts to follow decisions of equal or inferior courts. *O'Casek v. Children's Home and Aid Society of Illinois*, 229 Ill. 2d 421, 440 (2008). The opinion of one district, division, or panel of the appellate court is not binding on other districts, divisions, or panels. *Id.* Thus, the question before us is not whether *City of Champaign* was binding, but whether we agree with the decision made therein. *Schramer v. Tiger Athletic Ass'n of Aurora*, 351 Ill. App. 3d 1016, 1020 (2004).

¶ 61    After much consideration, we do not agree with the Fourth District's holding in *City of Champaign*. In that case, the Fourth District does not address the issue of malum prohibitum offenses for which no mental state is required and whether municipal ordinances can properly designate such offenses. We have, however, previously determined that the municipal ordinance in question here is a malum prohibitum offense and a proper exercise of Riverdale's police powers. As such, we decline to follow the Fourth District's holding as it does not address this issue. Instead, follow *Cannon* and other such cases where knowledge is not required when the offense at issue is malum prohibitum. See e.g., *Meadowlark Farms, Inc. v. Pollution Control Board*, 17 Ill. App. 3d 851 (1974); *Hindman v. Pollution Control Board*, 42 Ill. App. 3d 766 (1976); *Bath, Inc. v. Pollution Control Board*, 10 Ill. App. 3d 507 (1973).

¶ 62    Courts in other jurisdictions have similarly concluded that ordinances related to animal control impose near absolute liability with scienter, fault, or negligence being immaterial. See *Dragonette v. Brandes*, 135 Ohio St. 223, 224 (1939); *Peck v. Dunn*, 574 P. 2d 367, 370 (1978); *Egenreither ex rel. Egenreither v. Carter*, 23 S. W. 3d 641, 644 (2000); *McNeely v. U.S.*, 874 A. 2d 371, 386 (2005).

¶ 63    Further support for our decision to treat the ordinance at issue as a malum prohibitum offense is found in section 1.04.060 of the Municipal Code, which, as noted previously, any acts or omissions that are made unlawful by the Municipal Code "include causing, allowing, permitting, aiding, abetting, suffering, or concealing the fact of such act or omission." Reading this section in conjunction with section 6.08.020 establishes the legislature's intent to include passive actions that do not specifically require knowledge to violate the Municipal Code. Moreover, as we noted in *Cannon*, lack of knowledge or intent is not a defense to a violation of a prohibition punishable by fine which assigns liability for allowing or permitting a given result. *Cannon*, 61 Ill. App. 3d at 321.

¶ 64    In conclusion, we find that section 6.08.020 of the Municipal Code defines a malum prohibitum offense on a strict liability basis and that no proof of mental state is required to find liability.

¶ 65                          C.  Review of Factual Findings

¶ 66    Additionally, defendant contends that the manifest weight of the evidence supports reversal of her violation of section 6.08.020 of the Municipal Code, because Riverdale did not dispute that she never knowingly allowed or permitted her dogs to run outside of her home unleashed and

provided no explanation for why Beamon was not issued a similar citation. This argument is without merit.

¶ 67    Rulings on questions of fact will be reversed only if against the manifest weight of the evidence. *Board of Education of Valley View Community Unit School District 365-U*, 2013 IL App (3d) 120373, ¶ 37.   The hearing officer's determination is against the manifest weight of the evidence where an opposite conclusion is clearly apparent, or the fact-finder's finding is palpably erroneous and wholly unwarranted. *Kulchawick v. Durabla Manufacturing Co.*, 371 Ill. App. 3d 964, 969 (2007).

¶ 68    Here, evidence presented at the hearing established that in the afternoon of June 24, 2018, defendant's dogs pried open a window screen in the front of her home, escaped through the open window, and ran down the block and across the street to where Beamon's children and dog, Sky, were playing. There was testimony that LuLu grabbed Sky with her teeth and subsequently carried her back down the street near defendant's home, where LuLu continued to attack. When McSwain approached in order to retrieve Sky, Officer Jordan testified that Sandy charged McSwain, and he hit her with a steel pipe.   At that point, LuLu dropped Sky and charged McSwain, who was lying on the ground. After Officer Jordan shot LuLu, McSwain was able to move to safety and Beamon retrieved Sky who was bloody.   The evidence further revealed that a short time later, while Sergeant Kozeluh's back was to Sandy, Sandy regained consciousness and attempted to charge him. Officer Jordan subsequently shot Sandy. The evidence also showed that there were eight calls to the police station regarding the dog attack on that date.

¶ 69    None of the witnesses that testified on defendant's behalf actually witnessed the entire incident; the two neighbors (Washington and Thompson) both came outside after hearing the

gunshots. Defendant was not home during the incident, and neither was her son. Her son arrived at the house after the incident and then went to the police station.

¶ 70    We find that the evidence presented at the hearing supported the hearing officer's determination that defendant's dogs ran uncontrolled in violation of section 6.08.020(A); attacked another animal in violation of section 6.08.020(C); and damaged property other than the owner's in violation of section 6.08.020(D). We therefore conclude that the hearing officer's factual findings were not against the manifest weight of the evidence.

¶ 71                                        CONCLUSION

¶ 72    Section 6.08.060 of the Municipal Code was not subject to this appeal and we have not discussed it.  We only affirm the hearing officer's final order finding violations of section 6.08.020. Accordingly, we affirm the order of the circuit court which affirmed the hearing officer's finding as to violations of section 6.08.020 but reversed the finding of violation of section 6.08.060.

¶ 73    Circuit court judgment affirmed.

¶ 74    Municipal hearing officer order affirmed in part.